# THE DIOCESE OF TRENTON

*v.*

## JOHN F. TOMAN et al.

[Decided June 22d, 1908.]

1. A right of way appurtenant to a lot cannot be used for the purposes and benefit of another lot to which no such right is attached, even though such other lot be adjoining and within the same enclosure and in the same ownership as that to which the easement belongs.

2. If a lot to which a right of way appurtenant is attached be subdivided, each subdivision is entitled to all legitimate rights, by way of easement, which appertain to the entirety of the original lot.

3. An automobile is a carriage within the meaning of a covenant in a deed reserving a strip of land for a carriage-way forever.

4. An automobile garage is not a nuisance *per se.*

5. Facts examined, and *held* not to show that a certain automobile garage is so conducted as to constitute a nuisance.

On bill, answer, replication and proofs.

The controversy in this case relates to the extent of an easement in an alleyway leading from the easterly side of North Warren street, in the city of Trenton, between the property of the complainant on the north, the St. James Day Nursery, No. 136 North Warren street, and the Turkish Bath House on the south, No. 132 North Warren street. The easement in question was reserved in a deed from Samuel Evans and wife and the executors of Joseph H. Reading to William F. Pitcher, March 30th, 1858. The Trenton Turkish and Russian Bath Company has succeeded to the title of Pitcher, as to part of No. 132 North Warren street, but is not a defendant and is not concerned in the present controversy. The defendants, the Toman brothers, are now the owners of the rear portion of the Pitcher tract, No. 132 North Warren street, which also abuts on the alleyway. They

also own No. 130 North Warren street, adjoining No. 132 on the south, which lot, No. 130, runs back to the rear line of the portion of No. 132, which they own, and together the two lots form an L.

The defendants, on acquiring the title to the land in the rear of 132 North Warren street, which was part of the Pitcher lot, razed an old barn and fences which existed thereon, and, upon acquiring the premises No. 130 North Warren street, they razed the building on the rear thereof, thus obliterating the division line between the two properties, and erected on both of them a two-story automobile garage, covering the entire rear of No. 132 and a portion of the rear of No. 130, which building is used for the repair and store of automobiles. No. 130 North Warren street, which the defendants own, and upon a portion of which they have erected a portion of their garage building, was never parcel of either of the properties between which the alleyway is situate. When the defendants were about to commence the erection of their garage building, the complainant served written notice upon them that it would dispute their right to use the alleyway as an entrance to their garage.

The bill alleges, and the answer admits, that the garage building is so constructed that persons entering the same may, at pleasure, leave by way of either entrance, and not only that they may, but that they do use both entrances for ingress, egress and regress. The bill further alleges that the defendants, their customers and patrons, are using the alleyway for the purpose of entering and leaving the garage with their automobile machines at all hours of the day and night; that the machines are propelled by means of power generated from gasoline, and when in operation, they emit the odor of gasoline and volumes of smoke which permeate the atmosphere and enter the doors and windows of the complainant's dwelling, the side of which looks out upon the alleyway through some thirty windows and doors; that the automobiles while passing through the alleyway constantly make a variety of loud, disturbing and objectionable noises, interspersed with frequent explosions of gases, generated in the machines, and that the constant mechanical noises of machinery, while in

motion, affect and disturb the peace, quiet and comfort of the complainant's building, and create a nuisance. The bill further alleges that the defendants, by the joining of their two properties, have increased the traffic over the alleyway, not only from the lands to which the alleyway is appurtenant, but also from the other lands, 130 North Warren street, whereby they have increased the servitude of the alley, which is not, never was, and cannot be made servient to the premises No. 130 North Warren street, or any part thereof; that the defendants not only have increased the servitude by extending the limits of the land, and by increasing the traffic, but by subjecting the alleyway to the burden of an easement in favor of automobiles when the right reserved was for carriages drawn by horses only.

The defendants admit, practically, all of the allegations of the complainant's bill, and such denials as they make are quite immaterial for present purposes, because, coupled with their denials, they claim the right to do all of the things which the complainant alleges they are doing.

The alleyway in question was carved out by the reservation in the deed from Evans and wife and the executors of Reading and Pitcher, above mentioned, in 1858, and reads as follows:

"The whole of the vacant lot between the brick house hereby conveyed, and the house on the said lot late of said Philip F. Howell, deceased, which said last mentioned house is now occupied by George G. Roney is to be appropriated for a carriageway forever, for the benefit of the two properties between which it is situate, and running back to within thirty-five feet of the rear line, which said carriageway or alley is to be kept free at all times from all description of rubbish whatever, not anything to be thrown therein, but clear water, and each of the beforementioned properties, to wit, the house and lot of land hereby conveyed, and the house and lot of land where the said George F. Roney now resides, to have a private side alley, with gates affixed to them, and double gate is to be made to the entrance of the wagon or carriage alley, which said alterations or improvements are to be made as soon in the ensuing spring or summer as the parties to this deed may deem expedient. The work thereof to be done by the said William F. Pitcher, and each party to pay a proportion of keeping the same in repair."

The complainant insists and contends that the defendants have no right to use the alleyway as a means of ingress, egress

and regress to their garage with automobile machines, because—
*first,* the use which was to be made of the alleyway and which is
the subject of the express reservation in the deed was for a car-
riageway only for the benefit of the two properties between
which it is situate; *second,* because the defendants are now
using it in connection with their other property, which was
never a part of either of the two properties between which the
alleyway is located; *third,* because the use being restricted to a
carriageway, the servitude only extends to carriages or vehicles
drawn by horses, the term carriage, as used by the parties to the
conveyance, not extending to automobiles, and *fourth,* because
the defendants are creating a nuisance by using the alleyway for
an automobile passage.

The foregoing statement of the situation of the parties and
the premises in question may be better understood by reference
to the diagram hereto annexed. The properties of the com-
plainant, the Turkish and Russian Bath Company, and of the
defendants, are thereon delineated and given their appropriate
numbers on North Warren street. The alleyway in question is
labeled with the word *alleyway,* and, as will be seen, it lies be-
tween the property of the complainant on the north and the
Trenton Turkish and Russian Bath Company on the south, with
the defendants' rear portion of 132 North Warren street bound-
ing upon the alleyway for a short distance in the extreme rear
thereof. *A* is the alley leading from North Warren street to the
garage on south side of the defendants' property, No. 130 North
Warren street. *B* is the doorway into the garage from the alley
*A*. *C 1* is that part of the defendants' property covered by the
garage building which comprises the rear of No. 130, and *C 2*
is that part of the defendants' property covered by the garage
building which comprises the rear of No. 132, and which (*C 2*),
it will be remembered, is the rear portion of the Pitcher lot for
the benefit of which and the complainant's lot the alleyway was
originally carved out. *D* is the doorway into the alleyway from
that part of the garage building which bounds upon the alleyway.

45

Diocese of Trenton.
(St. James Day Nursery.)

No. 136.

Alleyway.

Trenton Turkish, &c., Bath Co.

No. 132.

John & Jeremiah Toman.

No. 130.

C 2.

D.

C 1.

B.

A.

North Warren Street.

A.—Alley into garage along south side of Toman's lot, No. 130 North Warren Street.
B.—Doorway into garage from the alley A.
C 1 & C 2.—Garage lot or lots.
D.—Doorway into garage at rear of alleyway in which easement exists.

*Mr. Peter Backes,* for the complainant.

*Mr. Richard C. Chamberlain* and *Mr. Hugh H. Hamill,* for the defendants.

WALKER, V. C.

The complainant's bill prays for an injunction restraining the defendants, the Toman brothers, from using the alleyway between the lands of the complainant, No. 136 North Warren street, and the lands of the bath company, No. 132 North Warren street, as a passageway for automobiles entering or leaving their garage building, through which, admittedly, they have the right of ingress, egress and regress over the alleyway for horse-drawn vehicles in connection with their lot in the rear of the bath company's premises, and which was formerly a part of the same lot.

The first and second grounds upon which the complainant rests its claim to an injunction are really one, and may be succinctly stated as follows: Because the defendants have a right of way only through the alleyway as appurtenant to their lot in the rear of No. 132 North Warren street for carriages drawn by horses.

If, as urged, the defendants have no right to use the alleyway for vehicles which enter their garage through the alley on the south side of their property, No. 130 North Warren street, they are, by so using it, subjecting the servient tenement, namely, the alleyway, to an additional and unauthorized burden, which is illegal and should be restrained. That the law is with the complainant on this question seems to me to be perfectly well settled by a long line of decisions both in England and in this country.

In *Allan* v. *Gomme, 11 Adolph. & E. 759,* it was held that a conveyance to A of certain premises reserving a right of way and passage over the *locus in quo* to a stable and loft in the same and a space or opening under the loft, to be used in common by both occupiers as tenants thereof had been accustomed to theretofore use them, that the reservation did not authorize B, who afterwards built a cottage on the site under the loft, to use the passage as a way to the cottage.

*Lawton* v. *Ward, 1 Ld. Raym. 75,* holds that under a right of way to a particular place a man cannot justify going beyond that place.

, *Colchester* v. *Roberts, 4 Mees. & W. 769,* involved a question of pleading, but Baron Parke observed (at *p. 773*) : "A license, therefore, to use a way to and from Black Acre, would not have included permission to go to or come from beyond.

One of the older cases, and probably the leading one in England upon this question, is that of *Howell* v. *King, 1 Mod. 190,* which was in trespass for driving cattle over the plaintiff's ground. It was thus reported :

> "The case was: A has a way over B's ground to Black Acre, and drives his beasts over B's ground to Black Acre and then to another place lying beyond Black Acre. And whether this was lawful or no, was the question upon a demurrer. It was urged that when his beasts were at Black Acre he might drive them whither he would. *Roll. 391 Nu. 40, 11 H. IV. 82; Brook, tit. Chimin.* On the other side it was said that by this means the defendant might purchase a hundred or a thousand acres adjoining to Black Acre, to which he prescribes to have a way : By which means the plaintiff would lose the benefit of his land : and that a prescription presupposed a grant, and ought to be continued according to the intent of its original creation. The whole court is agreed to this. And judgment was given to the plaintiff."

*Davenport* v. *Lamson, 21 Pick. 72,* was this : By the partition of a farm the right of passing and repassing across an eight-acre lot, belonging to the plaintiff, became appurtenant to a three-acre lot belonging to the defendant, who also owned a nine-acre lot which was beyond the three-acre lot, but was adjacent to and not separated from it by any fence. The defendant having loaded his cart with produce taken in part from each of his lots passed with it from the three-acre lot over the plaintiff's close, and it was held that the defendant had no right to use the way as a way from the nine-acre lot, although, in so doing, he passed last from his three-acre lot onto the plaintiff's close, and that trespass would lie for such abuse of the defendant's right.

In *Evans* v. *Dana, 7 R. I. 306,* it was held that an express grant of the right of access to and to take water from a well in close No. 1, as appurtenant to close No. 4, confers no such right upon close No. 3 adjoining, because not the same ownership as

No. 4, as to authorize the owner to pass through his close, No. 4, to the well, and take water therefrom for the use of his close, No. 3. The court observed: In regard to the right claimed to exist as appurtenant to close No. 3, to take water from the plaintiff's well over and across No. 4, it is sufficient to say that an easement is a burden upon the servient, and a right only in the dominant estate, and when created and declared by an express grant, cannot be extended beyond its plain language or clear intent. The easement appurtenant to close No. 4 confers, therefore, no rights upon close No. 3, and it makes no difference that they are now owned by the same party. *Evans* v. *Dana, 7 R. I. 311.*

A right of way appurtenant to a lot cannot be used for the purposes and benefit of another lot to which no such right is attached, even though some other lot be adjoining and within the same enclosure with that to which the easement belongs. *Farley* v. *Bryant, 32 Me. 474.* See, also, *Albert* v. *Thomas, 73 Md. 182; French* v. *Marstin, 32 N. H. 316; Webber* v. *Vogel, 159 Pa. 235; Greenmount Cemetery Company's Appeal, 4 Atl. Rep. 529 (Supreme Court, Pennsylvania); Coleman's Appeal, 62 Pa. St. 252; Shroder* v. *Brenneman, 23 Pa. St. 348; In re Private Road, 1 Ashm. (Pa.) 417; Greene* v. *Canny, 137 Mass. 64; Brightman* v. *Chapin, 15 R. I. 166; Shaver* v. *Edgell, 48 W. Va. 502; Springer* v. *McIntire, 9 W. Va. 196; Reise* v. *Enos, 76 Wis. 634; Stearns* v. *Mullen, 4 Gray 151.*

In the case of *Shroder* v. *Brenneman, ubi supra,* the supreme court of Pennsylvania remarked that the rule is stated in *Howell* v. *King* and runs through the subsequent cases, and that if the law were not so the owner of the close to which the right is appurtenant might purchase an indefinite number of adjoining acres and annex the right to them, by which the grantor of the way might be entirely deprived of the benefit of his land, a reason which applies with all its force to a private alley like that in respect to which the suit *(Shroder* v. *Brenneman)* was brought.

The case of *French* v. *Marstin, ubi supra,* was this: M owned what he called his "mountain pasture," consisting of the Bean, the Brown and the Scheafe lots. He contended that he had the right of way to this pasture over the land of F, but there was no

evidence that he had any such right to the Brown and Scheafe lots. It was held that notwithstanding he might have the right to cross the lands of F to go to the Bean lot, and notwithstanding the three lots might all be embraced in one pasture, he could not extend the right to the other lots, and that in crossing the land of F to go to the "mountain pasture" he would be a trespasser, and that F would have the right to use sufficient force to prevent his crossing. In this case (*French* v. *Marstin*) the supreme court of New Hampshire remarked (at *p. 329*) that the doctrine of the books upon this question is undoubtedly sound; that if a right of way to one lot be extended at will, by the tenant, to another lot that may adjoin it, then it may be extended to a third, and so on to any limits that the tenant may choose.

*Greene* v. *Canny, ubi supra,* is strongly analogous to the case at bar. In that case A owned a lot abutting on a private way to which was annexed a right of way therein; also another lot abutting on the way, and a third lot which adjoined the first-named lot. The two lots last named did not have annexed to them any right in the way. A removed a fence between the second lot and the way, also a wall between the first lot and the third, and used the way for the benefit of the second and third lots. It was held that the owners of other lots on the way, and having rights therein, could join in a bill of equity against A, and that, on such bill, the court could compel A to rebuild the fence, but would not compel him to restore the wall, although A had no right to use the way passing to it from the third lot over the first.

Although the portion of the defendant's premises in the rear of the bath company's property has been severed from that remaining to the bath company, which remaining portion is the front of lot No. 132 North Warren street, all legitimate rights, by way of easement, which passed to the entirety of No. 132, by the grant from Evans' and Reading's executors, still reside in the rear or subdivided portion. In fact, this is not disputed by the complainant. Among the cases illustrative of this doctrine are the following: *In re Private Road, 1 Ashm. 417; McMakin* v. *Magee, 13 Phila. Rep. 105.*

From the above authorities it clearly appears that the easement of the Toman brothers in the alleyway in question is appurtenant only to their lot in the rear of No. 132 North Warren street, and that the way is servient only to its use as a carriageway to and from the lot, and that they cannot enter upon the lot through the alleyway for the purpose of going beyond the lot to their premises, No. 130 North Warren street, nor can they, after passing them from the latter premises to the rear of 132, pass out through the alleyway.

This brings us to the third ground upon which the complainant rests its bill, namely, that the servitude extends only to horse-drawn vehicles, and that the word "carriageway" as used by the parties to the conveyance does not admit of an "automobileway." To this proposition I am unable to assent.

The words "carriageway" and "wagon or carriage alley" are those in the deed designating the use to which the alleyway may be put. No particular kind of carriage or wagon is mentioned. Although automobiles had not been invented at the time the easement was created, yet the language of the grant is unrestricted, and must be held to include any vehicle on wheels then or thereafter to be used.

A carriage is defined to be "that which carries, especially on wheels; a vehicle." *1 Am. & Eng. Encycl. L. (2d ed.) 155.*

A case entirely in point, on principle, is that of *Taylor* v. *Goodwin, 4 Q. B. Div. 228,* in which it was held that a person riding a bicycle on a highway at such a pace as to be dangerous to the passers-by, might be convicted of furiously driving a carriage under *5 & 6 Wm. IV., c. 50* § *72.* Justice Lush, concurring with Justice Mellor, made the following observations: "The mischief intended to be guarded against was the propulsion of any vehicle so as to endanger the lives or limbs of the passers-by. It is quite immaterial what the motive power may be. Although bicycles were unknown at the time when the act was passed, it was clear that the intention was to use words large enough to comprehend any kind of vehicles which might be propelled at such a speed as to be dangerous." As the English statute referred to comprehended any kind of vehicle under the denomination of carriage, so the words in the covenant in the deed in question are

large enough to comprehend any kind of vehicle, and, to my mind, it is quite immaterial what the motive power may be.

Mr. Huddy, in his *Law of Automobiles* (at *p. 3*), speaking of the machines which he calls automobiles or self-moving carriages, says that the only definition he has been able to find of them is that in *English's L. Dic. 78,* which states that the term means "all motor traction vehicles capable of being propelled on ordinary roads. Specifically, horseless carriages."

Automobiles were held to come within the definition of "carriages" in *Baker* v. *Fall River, 187 Mass. 53,* and in *Commonwealth* v. *Hawkins, 14 Pa. Dist. Rep. 592.*

*Baker* v. *Fall River* was a tort action by one for damages resulting from an injury sustained while traveling in an automobile by a defect in a street in Fall River. The action was brought under a statute of Massachusetts which permitted recovery by a person traveling with horses, teams and carriages. *1 R. L. (Mass.) 524 § 1.* The defendant requested an instruction that the act did not apply to one driving an automobile which was not a "carriage" within the meaning of the statute, but was more like a "machine." The instruction was refused and the trial judge said to the jury that he did not feel at liberty to instruct them that an automobile cannot be considered a carriage, and that if the other elements of liability were established he was entitled to recover. A recovery was had, and the supreme court, on appeal, remarked (at *p. 56*):

"Plainly an automobile is a vehicle which can carry passengers or inanimate matter, and so is such a carriage as the decision in *Richardson* v. *Danvers, 176 Mass. 413, 414,* said that the legislature had in view in the use of that word in the statute. * * * The automobile is a vehicle in common use for transporting both persons and merchandise upon public ways, and its use is regulated by statute. * * * We think that the plaintiff was not precluded from a recovery because of the nature of the vehicle in which he was riding, and that the instruction to that effect was right."

In *Richardson* v. *Danvers,* cited in *Baker* v. *Fall River,* although a bicycle was held to be a carriage within the provisions of a certain Massachusetts statute, it was nevertheless observed:

"We have no doubt that for many purposes a bicycle may be considered 'a vehicle or a carriage:   *   *   *

"The statute in question was passed long before bicycles were invented, but, although, of course, it is not to be confined to the same kind of vehicles then in use, we are of opinion that it should be confined to vehicles *ejusdem generis."*

*Commonwealth* v. *Hawkins* was this: Defendant was arrested, charged with operating an automobile in Pittsburg without first having obtained a license provided for in an ordinance of March 30th, 1905.  Justice Frazer remarked (on *p. 593*):

"While automobiles are not specifically named in the act of assembly (1868), they are certainly carriages.

"Webster's definition of carriage is 'that which carries or conveys; a wheeled vehicle for persons.'  In *Snyder* v. *City of North Lawrence, 8 Kan. 82,* the court said 'carriages are vehicles used for the conveyance of persons.'  In *Conway* v. *Town of Jefferson, 46 N. H. 521,* the supreme court of the state, in passing upon the right of a municipality to license vehicles, said 'carriages mean whatever carries a load, whether on wheels or on runners.'  Automobiles are wheeled vehicles used for the conveyance of persons.  In view of these definitions, and of our general knowledge of such cars, they may undoubtedly be considered as carriages within the meaning of the act of 1868.  That they were unknown when the act of 1868 was passed is not material."

Being of opinion that automobiles are carriages within the meaning of the words in the grant of the way, I come now to the consideration of the fourth and last contention of the complainant, namely, that the defendants are creating a nuisance by using the alleyway for an automobile passage.

It must be conceded that even if automobiles are carriages within the meaning of the covenant under consideration, nevertheless, the alleyway may not be used for their passage if in such use a nuisance is created.

Upon this question of nuisance my judgment is also against the complainant's contention.

Mr. Huddy lays it down that a garage does not constitute a public nuisance, and that an automobile station constructed on

land abutting on a boulevard does not constitute a common-law nuisance, quoting Mr. Justice·Woodward of the appellate division of the supreme court of New York, who, in *Stein* v. *Lyon, 91 N. Y. App. Div. 593,* declared that the business of a garage keeper appears to be perfectly lawful, observing (on *p. 596*) :

"It was argued by the plaintiff * * * that the maintenance of an automobile station along this boulevard * * * was a common-law nuisance, but the learned court has found to the contrary, and we have no doubt of the correctness of this conclusion. The business of the defendant appears to be perfectly lawful and legitimate."

In treating of what are and what are not nuisances *per se* it is stated in *21 Am. & Eng. Encycl. L. (2d ed.) 684,* that since there must be some place where every lawful business or erection may be lawfully located or carried on, the better rule would seem to be that a lawful business or erection is never a nuisance *per se,* but may become a nuisance by reason of extraneous circumstances such as being located in an inappropriate place or conducted or kept in an improper manner. This I understand to be in effect what was decided in *Weil* v. *Ricord, 24 N. J. Eq. (9 C. E. Gr.) 169,* in which it was held that the city of Newark could not absolutely prohibit the carrying on of a lawful business (salting and curing hides) not necessarily a nuisance, but which might be conducted without injury or danger to the public health, and without public inconvenience.

Another case illustrative of the doctrine that a business lawful in itself is not a nuisance, but may be made a nuisance by the way in which it is carried on, considering the place where it is carried on, is *Demarest* v. *Hardham, 34 N. J. Eq. (7 Stew.) 469.*

These garages occupy with relation to automobiles the same place that stables do with regard to horses, and stables have not been held to be nuisances. *Flint* v. *Russell, 5 Dill. (U. S.) 151; St. James' Church* v. *Arrington, 36 Ala. 546; Stillwell* v. *Buffalo Riding Academy, 21 Abb. (N. Y.) N. Cas. 472 (Supreme Court, Special Term).*

In *Flint* v. *Russell* it was held that a livery stable in the residence portion of a city is not, as a matter of law, necessarily to be considered a nuisance to the improved property adjoining or

near it. Said the court (at *p. 157*), quoting Lord-Chancellor Brougham: "Where the thing sought to be restrained is not unavoidably and in itself noxious, but only something which may, according to circumstances, prove so, the court will refuse to interfere."

In *St. James' Church* v. *Arrington* a bill was filed to enjoin the erection of a stable at the side of a church building and in close proximity to it, containing sixteen stalls, the allegation being that it would of necessity create a nuisance so aggravated as to militate materially against the welfare and usefulness of the church. The chancellor sustained a demurrer to the bill for want of equity, on the ground that a stable is not *per se* a nuisance, and the decree was assigned for error. The supreme court on appeal affirmed the decree.

In *Stillwell* v. *Buffalo Riding Academy,* the supreme court of New York held that although whatever may be obnoxious or offensive to the senses, either of sight, hearing or smell, or which will render the enjoyment of life or property unwholesome, or uncomfortable, is a nuisance—the erection and use of a building for the stabling of horses, or even the business of a livery stable, is not in and of itself a nuisance.

Of course, an automobile garage may be so conducted as to become a nuisance, and this brings us to an investigation of the facts relied upon as showing that the use of the alleyway for automobile traffic constitutes a nuisance. On that subject the bill alleges, as already remarked, that the defendants, their customers and patrons are using the alleyway for the purpose of entering and leaving the garage with their respective automobile machines at all hours of the day and night; that the machines are propelled by power generated from gasoline, and, when in operation, they emit the odor of gasoline and volumes of smoke, which permeate the atmosphere and enter the door and windows of the complainant's building, which look out upon the alley; that the automobiles while passing through the alley constantly make a variety of loud, disturbing and objectionable noises, interspersed with frequent explosions of gas generated in the machines, and that the constant mechanical noises of pro-

pelling machinery while in motion affect and disturb the peace, quiet and comfort of the complainant's building.

Depositions were taken before a master by consent for use upon the hearing. Two witnesses were sworn for the complainant, namely, Anna Bergin, known as Sister Michael, and Harry Lehey, and two for the defendants, namely, John F. Toman and Marx E. Cohen.

Sister Michael says that she is a sister at St. James Day Nursery, and has been with the nursery as long as it has been in Trenton; that there are about thirty-five windows on the entire side of the building facing the alley; that they have small children from babies a few weeks old up to twelve years; some stay in the house, which is occupied as a convent by seven sisters, the third and fourth floors being occupied for sleeping apartments; that the building is occupied daily by from thirty-five to forty-five children, up to twelve and thirteen years old; that the garage building had been erected since January 1st, 1907, automobiles using the alleyway and going in sometimes as many as eighteen times a day, between day and night; that she never counted them; that she has noticed them go through as late as eleven o'clock at night; that they retire at nine o'clock, and have been disturbed by automobiles going through; that she has been disturbed about three times, and the other sisters have complained about being disturbed, but she cannot say how many times; that they have not been very much disturbed by the machines going through in the daytime, but have been with the noise they make before going through; that the noises would wake the little children up and they would start screaming; that they have always been annoyed by the smell of gasoline and smoke from automobiles; that they could smell the gasoline in every back room and every room facing the alley; that before the garage was built there were gates on the front of the alleyway which were always closed, always except when being used; that the gate, though closed by the sisters as late as nine o'clock at night, has been found open the next morning; that they do not close the gate at all now, as it is too heavy for a woman to lift.

Harry Lehey testified that he was an attendant at the Turkish bath and has been for a year; that the alleyway leading between

the two properties (day nursery and Turkish bath) is used by Turkish bath people, and an automobile goes through there occasionally, the number that go through varies; that he could not tell the number; that he never saw any go through after eight or nine o'clock at night; that when they go through they make a mechanical noise, a noise like a cannon shot, once in awhile; that as to gasoline, at times they get it, but not always; that the patrons of the bath house complained sometimes when they wanted to sleep, the same as when the children next door make a noise; that they have not lost any patronage so far as he knows.

John F. Toman, one of the defendants, swore that there may be two or three machines going through the alley a day, some days none, some days maybe four or five, according to the jam they have in the garage; they use it for an outlet in case of congestion, the main entrance (to the garage) being on the south of their building, No. 130 North Warren street; that he never heard any machine make any more noise going through the alleyway than in passing along the street; that he did not think the smell of gasoline would last five minutes after a machine passes, if smelt at all; that as to smoke, very little comes from the machines as they pass through the alley, most of them not leaving any smoke behind; that he never heard any explosions in the alleyway; that he did not know of any explosions in the alleyway, none such as the sister spoke of, unless from a racing car with its muffler off; that they had two racing cars there for the fair (Great Inter-State Fair of 1907), whose mufflers were off when they went out, but they did not pass through the alley in question. He says there is a gasoline tank at the end of the alleyway from which automobiles are supplied.

Marx E. Cohen testified that he lived at 128 North Warren street, which is on the south side of the main alley leading into Toman's garage (not the alleyway in question); that his bedroom faces on the alley; that the passing of an automobile would not wake him up unless it was unduly noisy.

Of the seven sisters who occupy the day nursery, only one, namely, Sister Michael, was called. That she has been more or less disturbed by the automobile traffic through the alleyway is apparent. However, her testimony does not show a very serious

condition of disturbance by reason of the passing of automobiles. While she says that automobiles go through the alley sometimes as often as eighteen times a day she has never counted them, but has noticed them go through as late as eleven o'clock at night. She says distinctly that they have not been very much disturbed by the machines going through in the daytime. As to the smell of gasoline which annoys them, I am satisfied that that must come from the tank which Mr. Toman says is at the entrance of the garage at the end of the alleyway. While Sister Michael says that other sisters would have complained about being disturbed, the fact is none were called to give their knowledge upon the subject. Harry Lehey, who works in the Turkish bath house next door to the day nursery, said he never saw any automobiles go through the alley after eight or nine o'clock at night; he heard the noises, and that the patrons of the bath house complained sometimes when they wanted to sleep, the same as the children in the nursery made a noise. His likening the disturbance made by the automobiles to the noise made by the children would indicate that the noise made by the machines was not very great. The testimony of John F. Toman and Marx E. Cohen make in favor of the contention that as matter of fact the automobile traffic in the alley does not constitute a nuisance.

In *Westcott* v. *Middleton, 43 N. J. Eq. (16 Stew.) 478,* Vice-Chancellor Bird observed (at *p. 485*) :

"My attention has been called to the case of *Pennsylvania Railroad Co.* v. *Angel, 41 N. J. Eq. (14 Stew.) 316.* The principle there laid down is of great value in every such case. The defendant was engaged in a lawful business, but so used its tracks in making up its trains and distributing the cars in front of the complainant's dwelling that, by reason of stenches, noises, smoke, steam and the dirt thereby occasioned, the comfort of the complainant's home was seriously impaired. The court below allowed an injunction against such use of the road. But the court did not pretend to hold that the company must abandon the use of its tracks altogether. It was only decided that the company had no right to allow its engines or its cars to remain in the presence of, or near by, the house of the complainants, making hideous noises, emitting smoke and steam and unwhole-

some odors, to the great discomfort of the complainant in his home. The judgment of the court simply looked to the proper exercise of the lawful rights of the defendant, and in the lawful exercise of those rights what inconvenience or annoyance the complainants might suffer, they must submit to. Engines in passing might whistle or emit smoke, steam and dirt, cattle might bellow, sheep bleat and hogs squeal, but to that extent the complainants must yield to the general demand. To this extent the court was sustained on appeal. I can find nothing in that case to lead me to say that the business of an undertaker is a nuisance *per se.*"

The third syllabus in *Westcott* v. *Middleton* may be applicable to Sister Michael, especially in view of the fact that none of the other sisters were called as witnesses. It reads as follows:

"If a single person, of a most sensitive taste on the subject, is seriously disturbed thereby, and no others are called who have been annoyed, a case is not made requiring the interference of the court."

In *Hennessy* v. *Carmony, 50 N. J. Eq. (5 Dick.) 616,* Vice-Chancellor Pitney had before him a question of nuisance said to arise from two machines called "whizzers" used in the drying of dyed materials, and he held:

"There is a distinction between injuries which affect the air merely by way of noises and disagreeable gases resulting in personal discomfort and those which injuriously affect the land itself or structures upon it. As to the former, each person living in society must submit to a degree of discomfort depending in some matters upon the circumstances of his residence. As to the latter, the owner or occupant of land is entitled to enjoy it free from any direct injury which will appreciably affect its value."

My attention has been called by counsel for the complainant to the case of *First M. E. Church* v. *Cape May Grain and Coal Co., 73 N. J. Eq. (3 Buch.) 257,* in which Vice-Chancellor Leaming granted an injunction to restrain the defendant from operating a roller skating rink in a building adjacent to a church, it appearing that the noise from the rink was so great as to render it impossible to hold services in the church while skating was in progress. This case, in my judgment, is not an authority for the

granting of an injunction in the case at bar. That case (*First Church* v. *Cape May*) properly held that no person is justified in establishing a business adjacent to a church, the noise of which will render the continuance of the customary. religious services practically impossible, or which will interfere with such services to the extent of rendering it at times impossible for worshippers to hear the words of the preacher or the prayers which forms part of the services, or which will render the occupancy of the church parsonage a burden.

Vice-Chancellor Van Fleet, in *Demarest* v. *Hardhan, ubi supra*, adopted, as perhaps the most accurate statement of the rules to be observed in deciding the question of nuisance, this language used by Mr. Justice Mellor in charging a jury at the Liverpool assizes in 1863, viz.: "The law does not regard trifling inconveniences; everything must be looked at from a reasonable point of view. * * * In determining whether a nuisance exists or not, the time, locality and all the circumstances should be taken into consideration." This direction of the learned justice was approved by the court of queen's bench and afterwards by the exchequer chamber and finally by the house of lords. *St. Helen's Smelting Co.* v. *Tipping, 11 H. L. Cas. 642.* The English case just mentioned was an action for injuries done to property, but, nevertheless, in my judgment, the substantive law pronounced in that case is, on principle, applicable to this case.

The facts, in my opinion, do not make a case of nuisance against the defendants on the question of the operation of their garage.

My conclusions, therefore, are that the defendants of right may use the alleyway as a means of ingress, egress and regress to their garage with automobile machines, but that they may not after having gone upon that part of their property covered by the garage building, which comprises the rear of lot No. 132, and which is marked *C 2* on the diagram, go beyond that lot and on to *C 1* which is that part of their property covered by the garage building which comprises the rear of No. 130; nor can they, with automobile machines or vehicles of any description, go from the lot *C 2* out through the alleyway in question, having first entered *C 2* with their machines or carriages from lot *C 1*

adjoining, to which there is access from North Warren street on the south side of No. 130, through the alley marked *A* and the door to the garage building marked *B*. I conclude, further, that the defendants are not creating a nuisance by their use of the alleyway as an automobile passage.

An injunction will be issued restraining the defendants from going upon the lot *C 1* with automobiles or carriages through the alleyway and across *C 2;* also from going out through the alleyway with automobiles or carriages from *C 2,* which were gotten on to *C 2* from and off *C 1.*

The deed provides for a double gate at the entrance of the alleyway. This provision for a gate presupposes that it is kept closed. Sister Michael says that before the garage was built, the gates were nearly always closed, always except when being used; that the gate though closed by the sisters as late as nine o'clock at night, has been found open the next morning. In my opinion, the complainant is entitled to have this gate kept closed, and may include in the injunction an appropriate mandate requiring the defendants always to close it on each occasion of its use by them.