Statement of the Case.
MONROE, J.
Plaintiff herein, Mrs. A. M. Roby, wife of J. A. G. Roby, -with her grown stepsons, Bryon and Greer, and her two little boys, Virgil and another, issue of her marriage, were on their way to the Fair Grounds, near Shreveport, in a hired automobile, when one of defendant’s trains ran into the automobile, with the result that Mrs. Roby and Greer were badly injured and Virgil was killed. Three suits were brought for the recovery of damages, and, for the purposes of trial, they were consolidated, and, having been argued together, will be considered together for the purposes of the opinion, though a decree will be entered in each.
The family party, thus mentioned live in the country, and were visiting Shreveport probably for the purpose of attending the Fair, which was being held to the southward of the city. In order to accomplish that purpose, one of the grown sons hired a public automobile from the stand in front of the Phoenix Hotel, and requested IVm. Lowe, the chauffeur and proprietor, to take them to the Fair Grounds, giving him no other instructions than that he should proceed carefully. Lowe drove the machine, and he and Bryon Roby occupied the front seat, whilst the others occupied the back seat. They proceeded, without accident, out Texas street and Texas avenue (the one being a continuation of the other, as we understand), until they reached a point at Cedar street, where Texas avenue is crossed by nine tracks of the defendant company, and the accident occurred on the first, or most northerly, track, as follows:
Persons traveling southward on Texas avenue do not obtain a view of the railroad crossing until they get rather near it, as up to a point apparently say 100 yards, more or less, from the crossing, the avenue appears to run in a northeasterly southwesterly direction, and the railroad tracks also run slightly north of east and south of west. At the point mentioned (the distance of which from the crossing, we approximate, from the photographs in evidence) the avenue makes a turn to the soiithward, when the crossing be- | comes visible, the tracks crossing the avenue *883 at an angle which, to the eastward is less, and to the westward greater, than a right angle. On the northwest corner of the avenue and Cedar street there appears to be a three-story brick building, on the northeast corner, a two-story frame building, with a cornice, and with a shed extending out over the sidewalk and around the corner. The distance from the property line on the north side of Cedar street to the first (or most northerly track) we take to be some 15 or 20 feet, from all of which it will be understood that a person approaching the crossing, as was the party in- the automobile, is considerably at a disadvantage with regard to the approach of a train from the eastward on the first track, since the view is obstructed by the frame building, with the shed, on the corner, and, even when that is cleared, it is necessary by reason of the angle on that side to look somewhat backward, and, unless that should occur to the person concerned, he might very well be surprised by the approach of a train from that direction. The automobile in question came down the right (or western) side of the avenue, and its occupants were in a better position to have seen such a train than they would have been had they come down the left (or eastern) side, but they saw no train, nor, until they got within a short distance (variously stated by the witnesses) of the crossing, did they see any flagman. The crossing is obviously a dangerous one, since, as we have stated, there are nine tracks, and the point is regarded as within what is called the “railroad yards” — that is to say, within the territory in which on the one side defendant’s train is made up and broken up, and on the other side are its shops, so that, as we •apprehend, there is considerable switching and other movement of trains and cars going ■on at all times. Upon the other hand, Texas avenue is the main thoroughfare of the ■city, over which a large proportion of its traffic with, and travel into, the country is carried on, and, as it is also the route by which citizens and visitors in general reach the Pair Grounds, it can readily be understood that during the holding of a fair the situation demands the most • careful attention. The municipal authorities some years ago enacted an ordinance requiring defendant to keep a flagman at the crossing in question day and night; but, as the automobile in which the Robys were riding approached the first, or northward, track (between one and half past one o’clock, in the day), the flagman was standing between the second and third track, near the projected line of the eastward sidewalk of Texas avenue engaged in conversation with the driver of a wagon which had stopped there, and which, as also the little house intended for his shelter, were between him and the approaching train. He himself testifies that he would have been standing on the curb of the sidewalk “if the curb had gone across,” and Mr. C. A. Waits, a witness for defendant, testifies that the moment before the accident he was approaching the scene along what would be the westward sidewalk (if the sidewalk were extended over the crossing), and that he saw the flagman, the train, and the collision, and, further, as follows:
“Q. Where was the flagman when you saw him? A. When I first saw him, he was standing by a wagon. Q. On which side of the crossing? A. Right in the center of the tracks — the street crossing, about halfway between the tracks, probably a little this way [meaning nearer town], probably one-third on the way across the crossing. The wagon was standing in the tracks, or at the edge of the tracks. * * * ”
On cross-examination:
“Q. You say that the flagman was standing by the wagon? A. Yes, sir. Q. Now, where was the wagon? A. It was right at the edge of the tracks, about a third across. * * * Q. Headed this way [towards town]? A. Yes, sir. Q. What was the flagman doing — talking to the driver? A. Yes, sir. Q. He was talking to the driver? A. Yes, sir; I think so. He was standing there by him, looking at the driver. Q. You couldn’t tell that he was talk *885 ing? A. No, sir. Q. His attitude, though, was as if he was in conversation? A. Yes, sir; it seems that he was talking to him, judging from his attitude that he was standing in. * * * •Q. Now, that put the wagon between the flagman and the approaching train? A. Yes, sir; the wagon was behind the flagman and the • approaching train. Q. Now, at that time, ■about how far away was that approaching train? A. When I first noticed it, when the flagman stepped out and flagged the automo'bile, I then looked to see what the danger was, naturally, and I saw the train above there within about 40 feet of the crossing, of the tavenue crossing. * * * Q. Then at the time the flagman was talking to this man, the train must have been in the neighborhood of 40 feet, or 50 feet, of the crossing? A. Yes, sir. Q. When the flagman turned around and saw the :automobile, he rushed ahead and flagged him? A. Yes, sir. Q. The red flag in one hand and 'the white flag in the other? A. Yes, sir. Q. The flagman was very much excited? A. Yes, ■sir; a great deal. Q. He ran up in front of the automobile frantically flagging? A. Yes, •sir; within six feet of him. Q. When you first ■saw the automobile, it was about 40 feet from "the point where it stopped? A. Yes, sir. Q. At that time, or when you looked, or a little while afterwards, the train, you say, was about ■40 feet from the crossing? A. Thirty or 40 ■feet. Q. And to have added the distance from the crossing to the place where the automobile •stopped would have been 15 or 20 feet more; in other words, that street is 50 feet wide? A. Yes, sir. * * * Q. Then, if the flagman had left the automobile alone and not flagged him down, he could have passed over the track in rsafety? A. Yes, sir. Q. Without any ques■•tion? A. Yes, sir.”
Mr. J. E. Peyton, a witness called by plaintiff, testified that shortly after the accident the flagman in his presence pointed out to a ■number of persons the place where he was ■.standing when he first saw the automobile. 'The witness said:
“Mr. Horn [the flagman] said that he was standing right between the first, as I remember, between the second and third tracks. It was on a line between this house and the opposite •side of the street [witness marks with pencil on photograph ‘D’ place where he said he was •standing], right at the sidewalk. Q. Inside the ■curb? A. There was not any curb there. Q. At the point that you have marked ‘X’ on this Exhibit D? A. Yes, sir. Q. Where the sidewalk would be, if. extended across the street? A. Yes, sir.”
There were 46 witnesses examined in the -case, and there is more or less of conflict in their testimony; but, taking it all together, we think it clearly established that the flagman was engaged in conversation with the driver of the wagon at the point designated by the witness whose testimony has just been quoted, which point, as we have stated, is off to one side of the crossing, and not less than 20 feet to the southward of the northern side of the track on which the accident occurred, being the side from which the automobile was approaching; that, when the train and the automobile got within dangerous proximity of the point of collision, the flagman awoke to a sudden realization of the situation, and started in that direction; that there was no negligence on the part of those in the automobile in failing to see him, either at that instant or at any time, and that, as soon as they got the notice which he thus gave, the automobile was stopped; that unfortunately for all concerned it was stopped upon the first track, with the flagman waving his hands — a white flag in one and a red flag in the other — only a few feet in front of it; and that, if he had not thus stopped, the automobile, there would have been no accident. The last proposition is established beyond peradventure, or even denial, and to our minds strongly sustains the impression that the flagman completely lost his head when he realized that as a consequence of his absence from the front line and his inattention a dire calamity was likely to occur. It appears that, until the flagman came rushing in manifest excitement towards them, the occupants of the automobile were unaware of the proximity of the train, and that even then, and after the automobile had been stopped, they thought that the train was probably on another of the many tracks, and that they were safe. Looking about them, however, they instantly discovered that the train was almost on them, and the chauffeur endeavored to back the auto,mobile off the track, but, he says, his “gear would not go in mesh.” He therefore warn *887 ed his passengers to jump out, and he and Bryon Roby saved themselves in that way. Greer Roby, who was on the hack seat, had the younger of the two little boys between his knees, and he threw him out, so that the boy escaped without serious injury, but he himself was caught under the cars, and had his left leg and three of the fingers of his left hand crushed off, or so crushed that it was necessary to amputate them. The little boy, Virgil, who sat between his mother and his brother was killed. Mrs. Roby had the large bone (the humerus) of the right arm fractured up in the socket at the shoulder, had her left collar bone broken, suffered a scalp wound which laid bare six inches of the skull, and sustained severe bruises and burns. The train by which the damage was done consisted of an engine and 11 “bad order” freight cars, and the engine was pushing the cars to the shops in order that they might be repaired. Their bad condition is given as a reason why there was no air brake available for stopping the train, save that which was on the locomotive, from which, together, perhaps, with delay in giving notice to the engineer, who was at the other end of the train, nearly 450 feet away, it resulted that the train pushed and tumbled the automobile before it for about 70 feet, whereas, if the cars had been equipped with air brakes and the train had been going “head on,” instead of with the engine behind, and at the rate of 4% miles an hour, as some of the witnesses for defendant say it was, there would, probably, have been no one hurt. There is some conflict in the evidence in regard to the speed of the train and of the automobile; as to whether there was any “lookout” on the forward end of the train; as to statements said to have been made after the accident by the chauffeur and -one of the Robys and by the engineer of the train and the flagman, but we find it unnecessary to go into those questions farther than to say that the testimony, taken as a whole, does not satisfy us that the speed of either the train or the automobile was-unusual or unwarranted, or that there was no lookout on the end of the train, though we doubt whether he properly signaled the engineer.
Greer Roby is shown to be a farmer, about 31 years of age (in April, 1911), and married. His left leg was crushed at the knee, and was amputated above the knee,, but his condition was such that it was feared that he might not live through the operation, and it was somewhat hurried, and there-was not sufficient muscular tissue left to-make a proper flap. A second amputation, therefore, became necessary a few months later, and in the meanwhile he suffered a great deal. Beyond that he lost portions of' all the fingers of the left hand save the little finger, the thumb also being saved. His-expenses consequent upon his injuries were-$300.
Mrs. Roby, as we have stated, had the-humerus of her right arm broken into the-joint at the shoulder, and at the time that she testified was unable to raise her arm or forearm to her head, or make use of it for the purpose of dressing herself, or for-performing her accustomed household duties. The surgeons who testified in the case express the opinion that the injury is likely to be permanent, though, as we infer, her-condition will be better than when she testified. The fractured collar bone has mended, and the scalp wound, the bruises, and the burns have healed. The little boy, Virgil, was killed so suddenly as probably to have been conscious of no pain. He was-11 or 12 years old. There was a verdict in favor of Greer Roby for $10,000, in favor of Mrs. Roby for $1,000, and in favor of Mr. and Mrs. Roby, on account of the little- *889 boy, Virgil, in the sum of $500. Plaintiffs in answer to the appeals pray that the .amounts thus allowed be increased.
Opinion.
The pleadings in the three cases are practically the same, and the court is referred to the transcript bearing the title and number in the caption for all purposes. Defendant filed an exception of vagueness, and insists, in this court, that the only negligence charged is that its train was running at an unusual, danger-, ous, and prohibited speed, and that the crossing required two flagmen. The petition, however, contains something more than is thus attributed to it. It alleges that plaintiff was .a passenger, paying regular fare, in a public, licensed automobile; that, without negligence on her part, the automobile was struck by the train; that the train was running at a dangerous and prohibited speed; that the ■crossing was particularly dangerous (for reasons stated), and that the one flagman was insufficient; “that the train was backing .along the track and proper precautions were not taken to safeguard human life;” “that no signal or warning was given by defendant’s employés in such manner that petitioner could reasonably apprehend danger in time to save herself from personal injury.” And there are other general allegations of negli.gence and gross carelessness on the part of defendant; but those which have been cited appear to us to be sufficient for the purposes of the case. They include the charges that an engine and 11 freight cars were being rolled to, and over, a dangerous crossing, unprovided with the usual and necessary appliances for stopping them; that, instead of being pulled with the engine (which alone was. provided with a brake), in front, and the engineer (who alone had control of the one brake) in a position where he could see the •danger of a collision and make instant use at least of the appliances with which he was provided, the freight cars were being pushed with the engine and engineer nearly a block and a half in the rear, where he was incapable of seeing or measuring any danger in front, and, when information reached him, could only apply such stopping power as he could command to the engine, thereby leaving the freight ears to continue their forward movement until they exhausted the “slack”; that one flagman was insufficient to protect the public from the dangers of the crossing; and that neither the one flagman, whom the law required the defendant to keep there, day and night, in order that persons making use of the street might be properly warned of these dangers, nor any other employé of defendant, gave such warning in time to enable plaintiff to protect or save herself therefrom.
[1] The city ordinance (mentioned in the foregoing statement of the ease) provides:
___ “That all locomotives and rolling stock * * _ * shall be preceded by a flagman, while crossing, and come to a full stop; before crossing, the following streets [naming certain streets]. That a flagman shall be stationed, day and night [at certain named crossing and places]; that a day and night flagman shall be stationed at the railroad crossing over, Texas avenue (plank road) at or near its junction with Oedar street.”
[2, 3] The ordinance does not specify what the flagman, whether it be the one who is to precede the locomotive or rolling stock, or the night and day flagman, is to do, but its meaning is plain enough for all that. He is to give warning to the public that the defendant is about to operate a life destroying agency in a thoroughfare which the public is entitled to use, in order that the individual citizen may be placed on his guard and afforded an opportunity to protect himself, either by getting out of the way or by not getting in the way. Where no night and day flagman is required, the locomotive and rolling stock must come to a full stop before crossing, and be preceded by a flagman while crossing; but at the points where danger is to be apprehended at all hours the flagman is *891 required to be there at all hours. And by “there” we mean at the place where human beings are expected, and where they may expect to find him; and, being there, the law expects him to keep on the alert, so as to be able, from the proper place and within the proper time, to give the warning expected of him, and to stop the locomotive and rolling stock or the individual citizen, on foot or in a vehicle, or all of them, as occasion may demand. The space occupied by the nine tracks at the crossing on Texas avenue we assume to be something like 114 feet from end to end, or along the avenue (multiplying the width of the tracks and the spaces between by 9 and 8, respectively, and allowing 4 feet, 8 inches for each track, and 9 feet for each space), and it would do those who approach that space at one end but little good if the flagman were to keep himself at the other end, nor would it meet the requirements of the situation for him to keep himself upon either of the sides; that is to say, upon the line of either of the sidewalks of the avenue, projected over the crossings, for it is not there that any one would expect to find him or would be likely to look for his warning signal. In other words, according to our interpretation of the ordinance, it means that defendant is to keep a flagman at the crossing, and the flagman is not at the crossing of the northward track when he is 114 feet away, below the crossing of the southward track, or when he is somewhere between the two tracks upon the line of the sidewalk. Upon the occasion of the accident here in question the flagman was standing by the side of a wagon, talking to, or at least looking at, the driver in the space between, the second and third tracks, below the end of the crossing that the automobile was approaching, and he had his face turned to the eastward and his hands at his sides, and the wagon was between him and the approaching train. When he recalled himself to other matters, and, in the language of defendants’ witness (quoted in the statement of the-case), “stepped out and flagged the automobile,” the automobile, according to the estimate of the same witness, was 40 feet from the place on the northward track, where it. was stopped and was run into, and the train, was about 40 or 50 feet from the crossing or (the street, it is said, being some 50 feet wide) say from 70 to 90 feet from the same? place. If the witness is correct, and the automobile was moving at the rate of 15 miles-an hour (or 22 feet in a second), the chauffeur had less than two seconds within which, to stop it, where he did, assuming that he saw the flagman as soon as the witness did.. But the witness was coming from that end, walking, and had already seen the flagman before the flagman moved at all, and therefore naturally saw him when, and as soon as, he moved, whereas the chauffeur was-coming from the other end, and, if looking for the flagman at all, was looking for him where he had the right to expect to find him;, i. e., on the north side of the crossing, where-he might have been of some service to persons coming from that direction. He did. not see him, therefore, when he was standing by the wagon below the north side and to the eastward of the crossing, and his attention was not attracted to him until after he had “stepped out,” and in the meanwhile the automobile had been moving, so that, when he saw the flagman and recognized his signal, it was all that he could do to stop the automobile on the first track in front of, and but a short distance away from, the approaching, train. The testimony leaves no room for doubt that, if he had not been thus stopped by the flagman, who ran in front of him, he would have crossed over in safety, and probably without knowing that he had been in. danger.
*893 [4] Our conclusion is that the chauffeur had the right to expect that, if there was any approaching train which threatened danger, the flagman would be out in front of the crossing with his red flag to warn him of it (just as, in places where they use “gates” or bars which drop down across a street upon the approach of a train, persons using the street have the right to expect to see the bars in place if a train is‘ approaching), and that the failure of the flagman to be there and give the warning was the negligence to which the accident must be attributed. But even if that were not the ease, and we were to find that the chauffeur was guilty of negligence in failing to see the flagman or to heed his warning sooner than he did, such negligence cannot be imputed to those who were injured, since they were merely passengers in a public conveyance over the management of which they were exercising no control, and were strangers in the city, who, so far as the record shows, knew nothing of the manner in which the transit of vehicles over such crossings was regulated. In fact, Mrs. Roby had never been in an automobile before and did not know that they were approaching a crossing until they were almost upon it.
“There is no distinction, in principle, whether the passengers be on a public conveyance, like a railroad train or an omnibus, or be on a hack, hired from a public stand in the street for a drive. Those in a hack do not become responsible for the negligence of the driver, if they exercise no control over him, farther than to indicate the route they wish to travel or the place to which they want to go.” Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, 29 L. Ed. 652; Holzab v. New Orleans & C. R. Co. et al., 38 La. Ann. 185, 58 Am. Rep. 177; Perez v. New Orleans & R. Co., 47 La. Ann. 1391, 17 South. 869.
“The general principles of law applicable to livery stables and public hacks apply with equal force to the garage proprietor and the hack owner.” The Law Applied to Motor Vehicles, Babbett, § 615, p. 490, citing Smith v. O’Brien, 46 Misc. Rep. 325, 94 N. Y. Supp. 673; Diocese of Trenton v. Toman, 74 N. J. Eq. 702, 70 Atl. 606, 611 (1908).
See, also, Dale v. Denver City Tramway Co., 173 Fed. 788, 97 C. C. A. 511, 19 Ann. Cas. 1223.
We are of opinion that the amount awarded Mrs. Roby is inadequate, since, in addition to the physical and mental suffering sustained by reason of her bruises and burns, her broken collar bone and severe scalp wound, the breaking of the head of the humerus in its socket will cause her great inconvenience for a long time, and perhaps for the balance of her life, and for the wife of a farmer, the mother of children, and a housekeeper that is a more serious matter than it would be for others differently situated, though no one would be likely to place himself in her position for any amount of money that a court would award.
It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be amended by increasing the amount of the award to $3,000. It is further decreed that as thus amended said judgment be affirmed, and that defendant pay the costs of the appeal.