PRICE, Judge.
Aetna Casualty & Surety Company brought suit against Texas & Pacific Railway Company, Inc., to recover the sum of $662.46, the amount of subrogated damages resulting from a collision of an automobile insured by plaintiff and a train belonging to defendant. The accident happened at approximately 12:40 P.M., December 5, 1965, at the Line Avenue crossing of defendant’s railroad track just south of Shreveport, Louisiana. This crossing is protected by an automatic electric signaling device which warns traffic traveling both north and south of the approach of a locomotive to the crossing. Plaintiff’s assured, Larry E. Waters, and his wife were traveling in a northerly direction on Line Avenue, when the front of his 1963 Chevrolet struck the rear of the first of the four passenger cars being pulled by the locomotive in an easterly direction.
Plaintiff charged the defendant with negligence in failing to have the electric flasher signal device operating properly at the highly dangerous crossing, and in failing to give an audible warning of the approach of the locomotive to the crossing by the sounding of a whistle or bell in compliance with the Louisiana law.
Defendant, in its answer, denied these allegations, and, in the alternative, plead that the assured, Mr. Waters, was con-tributorily negligent in failing to slow or stop his vehicle or to look and listen for approaching trains before proceeding to cross the railroad track.
The trial court found from the evidence that the electric flasher signal was not operating at the time of this accident, and, this being the proximate cause of the collision, gave judgment for the plaintiff as prayed for.
Defendant has appealed devolutively, alleging that the trial court erred in finding *563 it guilty of any negligence, and, secondly, for not considering the plea of contributory negligence of the assured.
The following pertinent facts are clearly established from a reading of the testimony of the witnesses and an examination of the photographs in evidence depicting the scene of this collision. To the south of the crossing on Line Avenue there are two moderate hills with corresponding dips in the elevation of the roadway. The last of these hills is approximately 300 feet south of the crossing. The area parallel to defendant’s track immediately south and west of its crossing with Line Avenue consists of a high embankment covered with timber. This embankment extends to the ditch lying adjacent to the narrow shoulder of the roadway. The vision of the track to the west for a motorist traveling north on Line Avenue is obscured to such an extent that it is impossible for him to see any appreciable distance down the track until he is in close proximity of the crossing.
Mr. Waters was traveling northerly on Line Avenue at a speed of between 55 and 60 miles per hour. He had just passed a car traveling at a slower rate of speed driven by Mandel C. Selber, Jr., and was within 400 feet of the crossing when he saw the locomotive emerge from behind the embankment. Brakes were applied, and the car skidded, leaving 151 feet of skid-marks before striking the rear of the first car behind the locomotive. The locomotive was being operated at a speed of approximately 28 miles per hour, and the emergency braking system was applied about the time of impact.
We think the trial court’s finding that the automatic electric signaling device was not operating at the time of this accident is amply supported by the evidence. Mr. and Mrs. Waters’ testimony was corroborated by two completely disinterested parties, Mandel C. Selber, Jr. and Irving Selber, who were in the automobile immediately behind the Waters’ vehicle. All testified positively that the flasher signals were not operating. All of these witnesses testified that no warning bell or whistle could be heard by them signaling the approach of the locomotive to the crossing. The windows on the Selber car were down and no radio was in operation. The physical characteristics of this crossing for traffic proceeding north on Line Avenue are such that it is what is commonly called a “blind crossing.”
The trial judge, in his reasons for judgment dictated into the transcript of testimony of the case, found that the automatic warning signal was not operating. He then held as a matter of law that this absence of warning was an implied invitation to the public to proceed with impunity and without fear of injury, and, therefore, was the proximate cause of the accident.
As no mention was made by the district judge of the issue of contributory negligence of Mr. Waters, it must be assumed that he was of the opinion that a motorist owes no duty to exercise any greater care than to drive within the statutory speed limit when approaching a railroad crossing controlled by an electric warning device. We do not find this to be the law of this State.
In the case of Audirsch v. Texas & Pacific Ry. Co., 195 F.2d 629 (5th Cir., 1952), the court had under consideration facts and circumstances very similar to those at hand and refused to apply the “dangerous trap doctrine.”
In that case the motorist was driving east on Malcolm Street in the City of Shreveport, Louisiana, at a speed of from 10 to 15 miles per hour. The defendant’s switch engine, pulling 5 cars, was approaching Malcolm Street from the South at a speed of from 18 to 20 miles per hour. The front of the diesel engine struck the right center of the automobile.
Due to the presence of a store building and a high thick hedge along the south side of Malcolm Street the motorist could not *564 see the approaching train until he reached a point approximately 60 feet from the railway track. The collision occurred at night and the testimony established that the headlight on the engine was operating.
The crossing was protected by an automatic, electrically operated warning device, and the motorist testified that he knew the crossing and had used it frequently. The warning signal light was not operating as the plaintiff approached the crossing and, relying on this, had proceeded to enter the crossing.
The law of the State of Louisiana pertaining to the duty of care owed by a motorist at a dangerous railroad crossing was ably discussed in the Audirsch case, as follows :
“The appellant makes a very persuasive argument that the failure of this warning device to function along with the failure of the bell on the engine to ring, as to which also there was some evidence, would permit a reasonably prudent person to cross the track, and in support of that contention cites numerous pertinent authorities.1 [Citations omitted] While some Louisiana decisions are among the authorities relied on by the appellant, the later Louisiana cases are definitely to the contrary. In Martin v. Yazoo & M. R. Co., 181 So. 571, 579, 580, the Louisiana Court of Appeals said:
“ ‘He knew the condition of the crossing and the danger of traveling it without first stopping, looking and listening. He relied entirely upon the absence of the flagman as an invitation to proceed. This alone was not sufficient to relieve him from the duty of at least reducing the speed of the truck so that he could stop immediately, or to look and listen at a place where to do so would be effective. Aymond v. Western Union Tel. Co., 151 La. 184, 91 So. 671; Gibbens v. New Orleans Terminal Co., 159 La. 347, 105 So. 367.
“ ‘This last cited case discusses and modifies the ruling on this point in the case of Roby v. Kansas City Southern Ry. Co., supra [130 La. 880, 58 So. 696, 41 L.R.A.,N.S., 355]’.
“The Supreme Court of Louisiana discusses the question at length in Gibbens v. New Orleans Terminal Co., 159 La. 347, 105 So. 367, 370, 371 and in part says:
“ ‘While the precise question presented in this case has not been heretofore passed on by this court, it has been the subject of consideration in many other jurisdictions, and the doctrine laid down almost universally is as stated by the Kentucky court — Kentucky & Indiana B. & R. R. Co. v. Singheiser, 115 S.W. 192. In that case the court said:
“ ‘The use by the company of the most approved safety appliances does not relieve one using the throughfare of the necessity of exercising ordinary care for his own safety in so using it, and it was the duty of appellee in approaching this crossing to exercise such care, and, while it may be said that when he observed that the gates were up that this was an invitation for him to cross, it was not an invitation to cross at all hazard, but only an invitation to cross with due care and regard for his own safety.’ ”
ífí jji ;fc ?}: ;fc ;}«
“The appellant further contends that under the law of Louisiana, as reviewed by this court in Henwood v. Wallace, [5 Cir.,] 159 F.2d 263, the plaintiff was under no absolute legal duty to stop before moving on to the crossing; that he was entitled to rely upon more than ordinary care on the part of the defendant because it was a blind crossing, according to his contention, in that he could not see an approaching train until he reached the point about 60 feet from the railway track; and finally, that his failure to see the headlight of the approaching train until just before the collision should be excused because of the poor visibility due to fog and mist. He admitted, however, *565 that it was not so foggy but that he could see down the track.
“The substantive law of the state of Louisiana seems to have been correctly stated by this court in Henwood v. Wallace [sic] supra. Several later decisions of the Louisiana courts have emphasized the strict duty incumbent upon a traveler before crossing a railroad track. In Hutchinson v. Texas & N. O. R. Co., 33 So.2d 139, 143, the Louisiana Court of Appeals quoted with approval from an earlier decision of the Louisiana Supreme Court, Barnhill v. Texas & P. R. Co., 109 La. 43, 33 So. 63, as follows:
“ ‘The greater the difficulty of seeing and hearing the train as he approaches the crossing, the greater caution the law imposes upon the traveler.
“ ‘The traveler, however, is rigidly required to do all that care and prudence would dictate to avoid injury, and the greater the danger the greater the care that must be exercised to avoid it, as where, because of physical infirmities, darkness, snow, fog, the inclemency of the weather, buildings, or other obstructions and hindrances it is more than usually difficult to see or hear, greater precaution must be taken to avoid injury than would otherwise be necessary.’ ”
It has been urged that Act 310 of 1962, LSA-R.S. 32:171, has changed the duty of care imposed on a motorist at a controlled crossing. The statute which LSA-R.S. 32:171 replaced required all vehicles to come to a complete stop at all railroad crossings, yet the preponderance of the jurisprudence did not follow the rigid requirements of the prior statute.
This jurisprudential rule was stated in Matthews v. New Orleans Terminal Co., La. App., 45 So.2d 547 (Orleans, 1950), as follows:
“The law makes it the duty of a motorist to stop before traversing a railroad track, but that rule is not to be so rigorously construed as to require a position of absolute immobility, and it will suffice for such person to have the motion of his vehicle so retarded and under such control that he can stop instantly if need be, provided, however, he exercises due care in looking and listening for an approaching train.”
The pertinent portions of LSA-R.S. 32:171 are as follows:
“A. Whenever any person driving a motor vehicle approaches a railroad grade crossing under any of the circumstances stated in this Section, the driver of such vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
“(1) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train; * *
We do not interpret this act as having the effect of reducing the degree of care that a motorist must exercise for his own safety at a railroad crossing. This statute merely prescribes the specific situations when a motorist must bring his vehicle to a complete stop at a grade crossing. In this same Act of 1962 the Legislature recognized that there are conditions and hazards that exist which require that a motorist proceed at a slower speed than that generally prescribed for the particular road in question. LSA-R.S. 32:64, paragraph A, provides as follows:
“A. No person shall drive a vehicle on the highway within this state at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather, and in no event at a speed in excess of the maximum speeds estab *566 lished by this Chapter or regulation of the department made pursuant thereto.”
Mr. Waters’ speed was established to be between 55 and 60 miles per hour. He admitted being very familiar with this crossing as he lived in this vicinity and passed it frequently. Mr. Mandel Selber, Jr., who testified on behalf of plaintiff, stated that he considered this crossing to be very dangerous and that he always slowed his vehicle as he neared the crossing.
It is this Court’s finding that the speed of Mr. Waters was excessive under the conditions and potential hazards which existed at the scene of this accident. He knew of the dangerous nature of this crossing, yet he approached the crossing without reducing his speed until observing the train.
A reasonable and prudent man would have used more care by reducing his speed at this dangerous crossing to have protected himself from injury.
This negligence of Mr. Waters was a contributing cause of the accident which will bar any recovery by plaintiff under its subrogation agreement.
For the reasons heretofore assigned, it is ordered that the judgment appealed from be reversed and set aside, and that there be judgment herein in favor of defendant rejecting the demands of the plaintiff at its cost.