No. 4120

Second Circuit

BANFIELD v. LOUISIANA RY. & NAV. CO. ET AL.

(November 18, 1931. Opinion and Decree.)

Harry V. Booth and John G. Gibbs, of Shreveport, attorneys for plaintiff, appellee.

Wise, Randolph, Rendall & Freyer, of Shreveport, attorneys for defendants, appellants.

McGREGOR, J. On July 6, 1927, the plaintiff, James A. Banfield, was traveling from a few miles south of Lutcher, Louisiana, in a northerly direction to the city of Baton Rouge in an automobile owned and operated by one E. B. Bennett. He was employed by Ford, Bacon & Davis as a line foreman in the construction of a telephone line between Monroe and New Orleans, and Bennett was working under him as a lineman. The plaintiff's immediate superior was A. J. Harrison, superintendent of construction, whose office or headquarters was at that time in the city of Baton Rouge. There were two trucks in the plaintiff's charge at all times which were used for the transportation of men and materials from place to place as the occasion demanded. There was also a general understanding between Superintendent Harrison, Banfield and Bennett that whenever it was necessary for the plaintiff to go anywhere on business for the company, Bennett would take him in his car at the expense of the company. Several trips of this kind were made and in each case Bennett was subject to the orders and directions of the plaintiff. On this particular day it became necessary for the plaintiff to go to Baton Rouge, a distance of between fifty and sixty miles, to see Superintendent Harrison in regard to matters concerning the work under construction. They quit work and left on the trip at about 5 o'clock p. m., and on the way stopped several minutes at Lutcher for gas and oil and proceeded at a rather rapid rate of speed on their way to Baton Rouge. They were in somewhat of a hurry as it was their plan to return the same night. When they had reached a point about three miles from Baton Rouge, the highway crossed the defendant's railroad at a point known and referred to throughout the testimony as the 68 crossing. As they were in the act of crossing the railroad at this point, going in a westerly direction, there was a collision between the automobile in which they were riding and the defendant's southbound passenger train at exactly fifty minutes after 6 o'clock p. m. The result was that the automobile was hurled several feet down the track on the west side. Plaintiff was knocked out of the car and fell some distance from it, while Bennett stayed in it and was extricated therefrom by members of the train crew, who came to the assistance of the men. The two men were put on the train and carried back to Baton Rouge to be placed in the sanitarium for medical attention. Bennett's injuries proved to be rather slight, while plaintiff's were more serious, and this suit has been brought by him against Bennett and the Louisiana Railway & Navigation Company, in solido, for $32,877 damages.

In his petition the plaintiff alleges that his injuries and the resultant damages were caused by the combined fault, negligence, wantonness, lack of care, and gross carelessness of the two defendants. The

injuries are described as a fracture of the left femur bone and bruises about the body, cuts, scars and lacerations all over his body. It is specially alleged that the fracture of the femur has caused a permanent shortening of his left leg to the extent of approximately one inch. The damages claimed are itemized as follows:

(a) Loss of earnings from date of accident at $7.50 per day, being the wages plaintiff was earning_____$10,000
(b) Medical expenses expended and to be expended_____ 250
(c) Sanitarium expense_____ 127
(d) Fracture of femur, causing shortening of left leg, resulting in permanent disability _____ 10,000
(e) Pain and suffering, distress and shock _____ 7,500
(f) Injury to his back caused by bruises in the region of the kidneys and by being thrown a distance of eighty feet when struck by the train_____ 5,000
_____
$32,377

The negligence charged to the defendant, Louisiana Railway & Navigation Company, is:

(1) That its train approached the crossing at an excessive and high rate of speed.

(2) That no signal indicating its approach to the crossing was given.

(3) That the approach to the crossing was too steep and constructed in an improper manner, so that it was conducive to such accidents as occurred to him.

(4) That weeds and brush had grown on both sides of the right-of-way to such an extent as to obscure its trains and render this crossing extremely perilous.

No particular act of negligence on the part of Bennett is alleged in the petition, but in his testimony the plaintiff says that Bennett's negligence consisted of driving on the railroad in front of the train and getting hit.

Service of the suit was not made on Bennett in time for the trial.

In its answer the defendant, Louisiana Railway & Navigation Company, admitted the fact of the collision and injuries, but denied that they were caused by any negligence on the part of its employees. It is alleged that the proximate cause of the accident was the negligence of the plaintiff and Bennett, the driver of the automobile, as follows:

(1) That they were both under the influence of whiskey, which prevented them from having control of the car in a proper and prudent manner.

(2) That they failed to take necessary precautions to ascertain the approach of the train before attempting to go upon the crossing.

(3) That they failed to heed warnings and alarms signaling the approach of the train.

(4) That they went upon the crossing when the train was in such close proximity thereto as to make it impossible for the engineer in charge thereof to avoid the accident.

In the alternative the defendant pleaded that the intoxicated condition of the driver and his lack of proper control of the car should have been known to the plaintiff, if they were not, but met with no protest from him; that the plaintiff himself failed to take any precaution to observe the approach of the train, notwithstanding that he had ample opportunity to do so, and that all this constituted contributory negligence which bars the plaintiff from recovery of any damages for his injuries.

The case was tried by a jury and by a vote of nine to three the plaintiff was awarded judgment in the sum of $12,377. The defendant, Louisiana Railway & Navigation Company, has appealed.

## OPINION

In their brief counsel for plaintiff have confined their charge of negligence against the defendant to the following specifications:

(1) That the railroad crew failed to give the required signal or warning of its approach.

(2) That grass and weeds along the railroad right-of-way obstructed the view of the approaching train.

(3) That the condition of the approach to the crossing was hazardous and perilous.

In addition to these three counts of negligence, counsel urge that under the doctrine of the last clear chance plaintiff should recover for the reason that defendant's engineer did not apply the air brakes as soon as he should have done. The charge that defendant's train was being operated at an excessive rate of speed is abandoned.

With reference to plaintiff's contention that the train crew failed to give the required signals and warnings we find as follows: In his testimony as a witness in his own behalf the plaintiff stated that Bennett, the owner and operator of the automobile in which he was riding, stopped a few feet from the railroad track and listened to see if a train was approaching; that they neither heard nor saw the train and that they heard no whistle blow or bell ring; that they then proceeded to cross the railroad in low gear, traveling at a slow rate of speed. On this same point Bennett, the other defendant, but whose case was not tried, testified that no stop was made; that they did not slow down on account of the crossing. He states that he was driving at the rate of 45 miles as he approached the crossing and gave no thought to the possible approach of a train; that when he was within 12 feet of the track he suddenly saw the train coming from the right. It was then too late to try to stop so he says: "I seen I couldn't stop at that time and I just shot the juice to her and tried to make it." In answer to a question as to whether he looked to see whether a train was coming, he said: "No, sir, I wasn't looking nor listening." He states that he heard no whistle or bell. The plaintiff and Bennett are the only witnesses who testified in the case for the plaintiff on the subject of the signals the train crew gave for the crossing, and they both said that they heard no bell or whistle. The plaintiff says he listened and Bennett says he did not. On the other hand the defendant produced a number of witnesses who testified that the engineer blew the whistle and the fireman rang the bell. Mr. Dalton Reymond lived at the time of the accident near the railroad, about one and one-fourth miles north of the crossing where the accident occurred. He testified that he heard such an unusual amount of whistling at the scene of the accident that he got in his car and drove down there to see what had happened. A. M. Hickman, a resident of Baton Rouge, stated that at the time of the accident he was traveling in his automobile with his family on the paved highway parallel with the defendant's railroad in the same direction as defendant's train was traveling; that he heard the train whistle blow behind him; that when the train passed him at a distance of about 1,000 feet from the cross-

ing it was still blowing and continued to blow as it approached the crossing. Mrs. J. L. Francies lives on the highway about one-fourth mile north of the crossing where the accident occurred. She heard the whistle blow as it passed her house and paid particular attention to it and was distressed because of the fact that she knew her little boy was in close proximity of the track. She ran out to see if he was in danger and as he got out in front of her house she saw that an accident had occurred at the crossing. J. L. Stephens, his wife and son were on this same highway traveling in an automobile just a short distance ahead of Mr. Hickman. They all testified that they heard the train whistle before it passed them at a point about one hundred yards or less from the crossing and that it continued to blow until it reached the crossing and hit the automobile in which plaintiff was riding. Anthony Davis, a negro living in a house that was on the west side of the railroad, facing it and a short distance below the crossing, was an eye-witness to the accident and testified that the train whistle blew at the usual "whistling place" and "continued a good while. Most up until she got to the crossing." His stepson, Leon Burris, had gone across the railroad for his cows and his fear that the boy might be in danger caused him to be more alert and to pay closer attention to the whistling and to remember the incident more distinctly. Leon Burris, the stepson of Anthony Davis, just referred to, testified that he was on the same side of the railroad that the plaintiff was just before the accident, about two hundred feet from the railroad; that he heard the train whistle, beginning near the house of Mr. Baylis, who lived several hundred feet from the crossing, and that it "blowed until it hit the car." Ed Black, a white porter or flagman on the train, testified that the engineer blew the regulation crossing whistle, that the bell was ringing and that suddenly the air brakes were applied to the train. Alex Patterson, the fireman, testified that he commenced ringing the bell at the regular whistling post and continued to ring it until the crossing was reached; that the engineer blew the whistle at the usual place, that he suddenly discovered the automobile and warned the engineer to apply the air brakes at once. He testified that the whistle was blowing just before and at the crossing and that the air brakes were applied before the crossing was reached. C. B. Brandon, the engineer, testified that he blew the whistle at the usual place and then again at about the distance of two telephone poles he blew another crossing signal and held the last signal until the engine was on the crossing; that that method of whistling is used at all crossings. He testified further that just before reaching the crossing the fireman warned him that an automobile was approaching from the east as though it were going to cross ahead of him and that he instantly applied his air brakes, stopping the train in two train lengths, which carried him beyond the crossing a distance of one train length.

In their brief counsel for plaintiff say:

"Without discussing the testimony of each of these witnesses in detail, it will be particularly observed that not a single witness, either the train crew or supposed bystanders, testified that the train either blew its whistle or rang its gong for a distance of three hundred yards from the crossing continuously. In fact, it is quite apparent that the crew did neither ring its bell nor blow its whistle continuously during this distance."

We read the testimony differently. Every witness that testified on this point for

the defendant except the co-defendant, Bennett, testified that the whistling began at the usual whistling place, a distance of 1,000 feet or more from the crossing, and continued practically continuously until the crossing was reached. In another place in their brief counsel for plaintiff say:

"Not a single witness testified that the warning given by the train was such as complied with Act 12 of 1924."

The provision referred to reads as follows:

"That every railroad company shall cause each locomotive engine run by it to be provided with a bell of at least thirty pounds weight and a steam whistle which can be heard distinctly at a distance of three hundred yards, and shall cause the bell to be rung or the whistle to be blown at the distance of at least three hundred yards from the place where the railroad crosses over any highway or municipal street, and the bell shall be kept ringing or the whistle shall be kept blowing continuously until said crossing is passed." Section 1.

It will be noted that the requirement of the law is fully met if either the bell is kept ringing or the whistle is kept blowing. There is overwhelming testimony that this provision of the law was fully complied with in that the bell rang continuously over three hundred yards. In addition to that the whistle blew over 1,000 feet from the crossing and then again from a distance of two telephone poles continuously until the crossing was reached and the accident had occurred. According to the great preponderance of the testimony the defendant was guilty of no negligence whatever in the manner of giving signals by whistle and bell in accordance with the provision of Act No. 12 of 1924.

The second and third charges of negligence urged by plaintiff may be considered together as plaintiff's counsel have done in their brief. Honorable Howell Morgan, former state treasurer and state banking commissioner, testified that he was familiar with this 68 crossing at about the time of the accident involved herein. He is very positive that it was in a bad condition. The gist of his testimony is covered by the following quotation from it:

"A. In going to Baton Rouge you went down an incline into a cup-like hollow that the water rushed into from the railroad tracks from the lefthand side and didn't always get out. It was quite a mud hole there at times, so much so that in driving through it you had to put your gear in second and go up rather fast. You went up a steep bank on to the railroad tracks and did not see those tracks until you got practically on them, until you got up that incline. Then the railroad itself to the right which was towards Baton Rouge, was hidden from view not only by grass and shrubbery but by some little trees that were there.
"Q. All right, as to weeds and brush, Mr. Morgan?
"A. All right. Now when it comes to the right-of-way itself I don't know just exactly the distance from the road that it extends but I know that as you went down into this ditch or hollow that upon the right-hand side there was grass. Sometimes the grass was old and brown, other times it was growing. There was considerable brush all along there and I know that before you got into that ditch that you could not see a train coming from Baton Rouge. Now whether that brush was on the right-of-way itself, I do not know."

\* \* \* \* \* \* \*

"A. I would say it is between ten feet and fifteen feet high from the bottom of that ditch to the railroad track."

\* \* \* \* \* \* \*

"A. Why the grass itself was very high. It looked like Johnson grass. I do not know whether it was but it was very high. I do not know just how high. I know that the grass and weeds and the brush obscured the view to the right of the railroad altogether and you could not have seen a train any distance at all down that track."

Mr. Morgan appears to be very positive in his opinion of the condition of the crossing both as to its steepness and the height of the weeds and brush on the right side of highway that he says obscured the view of a motorist traveling toward the city of Baton Rouge. In this opinion he is corroborated to a certain extent in some particulars by S. R. Barman, B. B. Riley, and G. F. Van Dussen. It will be noted that Mr. Morgan states that between the end of the graveled highway on the east side of the railroad and the railroad tracks there was at the time of the accident a "cup-like hollow," into which water rushed when it rained and did not always get out, thus causing a mud hole. He states further that it was necessary to go into low gear in order to go upon the crossing and that the crossing was between ten and fifteen feet above the bottom of this so-called mud hole. He states further that if one proceeds to cross the railroad at this place one could not see the tracks until practically upon them and that the view up the railroad on the right side toward Baton Rouge was obscured by grass and weeds and shrubbery. S. R. Barman took a kodak picture of the crossing a few days before the trial, which he says differs from the appearance of the crossing at the time of the accident on July 6, 1927, in only two particulars, namely: (1) The level of the approach to the crossing is just a few inches higher in the picture than it was at the time of the accident, and (2) that the weeds and grass at the time were not as high as they would be on July 6, the date of the accident. The kodak was 370 feet from the crossing on the east side. His testimony is that at the time the picture was made one could see a train 150 to 200 feet from a position 70 to 100 feet from the crossing on the east side. The picture itself shows an un-obscured view of the track for some distance toward Baton Rouge, and it was taken from a point 370 feet from the crossing, which would place it beyond the curve where the road straightens toward New Orleans. Barman states that the incline from the so-called mud hole has been raised a few inches. There is no semblance of a bad place in the road shown in the picture, as is described by Mr. Morgan. Mr. B. B. Riley of Baton Rouge was called to the scene of the wreck to remove plaintiff's car. It is his testimony that the elevation of the railroad above the highway at its lowest point on the east side is about eight feet and that the weeds and high grass grow six feet tall within fifteen feet of the railroad tracks. He states that one could stop one's car thirty or forty feet east of the track and see a train fifty or seventy-five feet up the track toward Baton Rouge at the time of the accident. Mr. Van Dussen, another witness for the plaintiff, testified that the approach to the crossing on the east side was about eight feet high, but he testified practically nothing about the alleged weeds and grass. The plaintiff himself testified that the automobile in which he was riding came to a complete stop twenty-five or thirty feet from the track and that from that point he could see thirty or forty feet up the track toward Baton Rouge. Certainly as he proceeded toward the track from that point the distance he could see up the track increased rapidly.

Opposed to this testimony of the plaintiff there was an overwhelming preponderance of testimony introduced by the defendant to the effect that there was ample opportunity to see a train coming from Baton Rouge as plaintiff approached the crossing from the east side. So that we hold that no negligence on the part of the

defendant with reference to the approach to the crossing or with reference to the weeds and grass which are alleged to have obscured the view up the track has been shown.

Since we find that the defendant was free of negligence in the case; that it complied strictly with the law in the matter of giving the required signals, and that neither the steepness of the crossing nor the weeds and grass on the right-of-way contributed to the accident, it is not necessary to go further in the case to discuss in detail the question of plaintiff's and Bennett's negligence. We have made a very thorough study of the entire record and have devoted unusual amount of time to it. It is established by a clear preponderance of evidence that Bennett did not pretend to decrease the speed of his car as he approached the railroad crossing; he was traveling at the rate of forty-five miles an hour as he approached and reached the crossing, and gave no thought whatever to the possible approach of a railroad train at that point. Furthermore, plaintiff never uttered a word of protest of any kind at any time. He not only was a passenger in the automobile, sitting on the right side of Bennett on the side next to the approaching train with every opportunity to see it, but Bennett was under his control at the time, subject to his every order. At different times during the trip he had urged Bennett to hurry and to step on the gas. The accident was clearly and undoubtedly the result of the gross carelessness and negligence of Bennett, the owner and driver of the automobile. The plaintiff had every opportunity to see and avoid the danger from the approaching train, but did nothing and said nothing. Under the circumstances he was guilty of negligence whether considered in the light of a simple passenger or as being in charge and control of the movements of Bennett.

If the version of Bennett is accepted there can be no doubt of his negligence, as well as that of the plaintiff, for he says he rushed toward and over the crossing at the rate of forty-five miles an hour without giving it any attention whatever. If plaintiff's version is correct—that the car came to a complete stop several feet from the crossing and went into low gear in order to climb the steep approach—there was ample opportunity both to see and hear the approaching train in time to stop before going upon the track. The failure to see or hear the train under these circumstances would indicate an extreme lack of attention on the part both of Bennett and the plaintiff. According to either version, the car was driven upon the track in front of the train in a heedless and reckless manner. It was a danger that plaintiff was well aware of and he uttered not one word of protest and did nothing to try to avoid the accident. The fact of the presence of the railroad crossing was a warning to Bennett and plaintiff to beware of danger. It spoke to them in thundering tones. If the view was obscured as plaintiff claims it was, his duty to approach this crossing with care and caution was all the greater. In addition to their personal knowledge that they were approaching a crossing that plaintiff seeks to establish was perilous and hazardous, there was a railroad sign warning them to stop, look and listen, one hundred feet or more from the crossing. Then as they approached still nearer, there was the Louisiana law stop sign. All these warnings were unheeded by both. In the case of Baltimore & Ohio Railway Company v. Dora Goodman, Administratrix, 275 U. S. 66-70, 48 S. Ct. 24, 25, 72 L. Ed. 168, 56 A.L.R. 645, Mr. Justice Holmes said:

"When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop, and get out of his vehicle, although obviously he will not often be·required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk."

The doctrine of the last clear chance can have no part in the decision of this case. The fireman did see the plaintiff in time for the train to have slowed down and to have avoided the collision, but he had a right to think that since he could see the car, the driver of the car could and would see the train and would stop before reaching the crossing. It is a matter of common knowledge that many motorists drive just as rapidly and as close as possible before stopping both at railroads and highway crossings. The fireman knew that he· was ringing the bell and that the engineer was blowing the whistle at that very moment and that the driver of the car should hear them. For these reasons he did not warn the engineer of the approaching automobile as soon as he saw it. But as soon as it appeared that the driver of the automobile was trying to cross ahead of the train, he did give the necessary signals to the engineer and every effort was made instantly to avert the disaster. The judgment in favor of the plaintiff is clearly erroneous and should be reversed.

For the reasons assigned the judgment appealed from is hereby annulled, avoided and reversed, and it is now ordered that there be judgment in favor of the defendant, the Louisiana Railway & Navigation Company, dismissing plaintiff's suit against it, at his cost.