MARTIN v. YAZOO & M. R. CO. et al.
No. 5540.

Court of Appeal of Louisiana. Second Circuit.

Jan. 28, 1938.

Rehearing Denied April 1, 1938.

Writ of Certiorari and Review Denied May 30, 1938.

Thompson & Thompson, of Monroe, for appellant.

Julius T. Long, of Shreveport, for appellee.

Theus, Grisham, Davis & Leigh, of Monroe, for intervener.

DREW, Judge.

Plaintiff sues in her own behalf and in the behalf and for the use and benefit of her minor child, born of her marriage with E. L. Martin, to recover damages for the death of her said husband and the father of her minor child, caused by a collision between a truck in which decedent was riding and a passenger train of defendant company, at a point where Walnut street intersects or crosses the railroad tracks of the defendant company at Jefferson street in the city of Monroe, Louisiana.

The acts of negligence charged by plaintiff to defendant are many and, for the purpose of this opinion, we will attempt to enumerate those necessary to a decision:

Plaintiff charged that defendant's passenger train at the time of the accident was running late and was traveling at a dangerous and excessive speed, in violation of a municipal ordinance; that the crossing where the accident occurred was unusually hazardous because of the near convergence there of Walnut and Grand streets, and the obstruction of one's view when approaching the crossing from the south by tall buildings near defendant's right of way; that said corner was not properly protected by mechanical devices or a sufficient number of flagmen; that at the time of the accident the flagman on duty was not in a position to properly warn or admonish traffic of the oncoming train with which the truck collided; and that the train, by reason of the extra hazardous corner, should have been required and was required to move slowly, preceded by a flagman walking ahead of the train to warn traffic of the movements of the train.

Plaintiff further alleged the traffic at this corner was very heavy, with automobiles, trucks, etc., constantly passing; that there was much noise in this part of the city which interfered with hearing an approaching train; and that the location of the corner was in the heart of the city of Monroe.

In the language of counsel for plaintiff, the allegations of negligence are as follows:

"That the said passenger train, leaving defendant's depot in Monroe at about 7 o'clock P. M., November 4, 1935, and

traveling west about half a mile, came to Walnut street of said city, 'at a dangerous, excessive and illegal rate of speed;' that 'a large motor vehicle truck of the Tom Hicks Transfer Company, Inc.,' loaded with fully ten thousand pounds of paper and products of the Brown Paper Mill Company * * * and its driver's seat occupied on the left by I. D. Dycus, an employee of the said company and driver thereof, by James R. Johnson in the middle, and the said E. L. Martin on the right side', traveled at a 'reasonable and moderate rate of speed in a northerly direction from DeSiard street on said Walnut street, and, being operated in a cautious and prudent manner near the said main line of defendant, was struck, mostly upon its right side, by said passenger train crushing and mangling the head, body and limbs of the said E. L. Martin, causing his instant death'; that upon the said Dycus becoming aware that said train was approaching, forcibly applied the brakes of the said truck and did all he could to avoid the said truck being struck by said train, even turning the said truck all he could to the left * * * it was impossible for him to avoid the said collision; that the said collision occurred in the 'center and heart of the business section and heavily traveled portion of the city of Monroe * * * at a time of day and night when noises from automobiles, trucks, newsboys, hotel criers and porters, steam whistles, radios, taxicab drivers and peddlers were all making great noise at and near the point where the said accident and collision occurred, sufficient to drown out and render of no use or service any whistle or ring of bell from the said train made .at anytime before said train was practically in the act of striking the said truck.'

"That Walnut street and Grand street at DeSiard are 200 feet apart; that both, running north from that street a distance of about 150 yards, come to the defendant's railroad tracks; that in that distance they run slightly diagonal toward each other so that there is only about 40 feet between them immediately before they reach the said railroad tracks; that there are high brick buildings on either side of each of the said streets in said block extending to close proximity to the tracks; that there is a brick building 40 feet wide on its west and between said streets, and 30 feet high, immediately south of the said railroad tracks; that there was and is a

brick building immediately south of the said crossing three stories high, abutting on the east side of Walnut street a width of fully 100 feet, the north wall of said brick building and the said west wall of same extending to within 20 feet of the said main line track of the said defendant upon which the said passenger train was traveling; that there is and was then a side track, being between this said last named brick building, the said side track extending to within a few feet of the west end of the said brick building, back east some three or four hundred yards, upon which side track there are constantly left box cars standing, some within 15 feet of said Walnut street, and sufficiently near to cut off the view to the east of a man operating a motor truck on Walnut street in approaching the said main line; that the said intersection is paved in and between each of the streets at said railroad crossing, a distance of over 100 feet north and south and 200 feet east and west; and that about 60 yards north of the said intersection, the two streets converge and become one.

"That a very steep incline in the paving and grade of said Walnut street begins about 90 feet south of the said main line track and extends to within 15 feet of said main line track; and that said incline was so steep that it required either second or low gear of the said loaded truck to climb same.

"That, under the requirements of officers of the said city of Monroe, especially traffic regulations of the said city, motor vehicles going north on Grand street are required to turn right on coming to the south side of said paved area and go in an easterly direction to Walnut street; that vehicles traveling north on Walnut street, on coming to the said intersection, had the right to and did often turn left and back into and back south on Grand street; and that the said traffic was very heavy in said area at all times and particularly at the time of the accident each day and night.

"That despite the aforesaid conditions as to traffic regulations and travel, the noise and confusion about said point, the height and proximity of the said buildings and their position, no kind of electric or mechanical device or machinery has ever been used by said defendant to warn travelers and vehicles crossing at said points of the approach of passing trains to and

over said crossing; that for many years the said defendant in disregard of its duty to the public and lives and happiness of those who may travel over said crossing, the said defendant had but one flagman about the said crossing of the said Grand and Walnut street or that part of Jefferson which is paved and traveled in said area. That no matter how capable and active any one man acting as flagman, with no special device for giving unusual alarm, such a man could not and cannot afford the people and public who cross at said point that reasonable care and precaution, ordinary prudence would indicate, where the opportunity to hear or see a train was so slight and the travel so heavy and great.

"That, as had been the custom of the said lone flagman at said point and crossing, when he saw the said passenger train had approached within 100 yards of the east side of said crossing and Walnut street, the said flagman rapidly went away from Walnut street west into Grand to be in time to give persons traveling both north and south on Grand street and east over Jefferson street, warning of the approach of the said passenger train. That about the time the motor truck left De-Siard street on its way on Walnut to cross the said railroad tracks, the said flagman left from Walnut street going to the said Grand street; that neither the said driver nor any of said occupants of said motor truck had any kind of warning of the approach of the said train until it was seen by the deceased; that at the time Martin saw said train, the front end of said truck had reached within 15 feet of the said main line, and the flagman was standing and being about the center of Grand street and north of all the said railroad tracks of and at said crossing, and began to shake his lantern and to hollo, at or for what the driver nor any other person near said crossing could tell or know; but the said flagman, when thus holloing and shaking his lantern, was fully 150 feet from the point the said accident occurred, and at a point that he could be of no aid in warning the occupants and driver of the said truck of the approach of the said passenger train. That in the absence of mechanical devices for warning at said crossing, it would have required and did require the presence and active service of not less than three flagmen at said crossing to have given the said travelers over and about the

said crossing that reasonable warning of trains about to cross the said streets to which the public and said travelers have been entitled for the past several years and were entitled to at and immediately before the said accident. That it was great negligence on the part of the said defendant in thus failing to provide a sufficient number of flagmen at said crossing or mechanical devices which would have afforded reasonable protection to the public.

"That not having adequate number of flagmen or other mechanical devices at said crossing for protection of the traveling public, it was great negligence for the said train, as it did at the time of the said accident, enter Walnut street and said paved area, traveling at a fast rate of fully 30 miles an hour, in disregard of the said City ordinance prohibiting it from traveling more than six miles per hour within the said city limits of Monroe, Louisiana; that it would have been gross negligence for the said train at said time to enter the said crossing while traveling at a greater speed than 10 miles per hour, in fact, under conditions then obtaining at said crossing, it was great negligence for the said train not to have been brought to a complete stop just before it entered Walnut street at said crossing, with a flagman a few feet ahead of it to warn the public of the movements of the said train and it cross the said streets."

The General Accident Fire & Life Assurance Corporation, Limited, intervened in the case, adopting all and singular the allegations of plaintiff's petition, particularly those relating to the negligence of defendant. It alleged it was the insurer of the Tom Hicks Transfer Company against losses arising under Act No. 20 of 1914, and amendments thereto, and that on account of the death of E. L. Martin, who was at the time an employee of the assured, it had paid to plaintiff the sum of $424.57, at the rate of $8.32½ per week, and would continue to pay to her for the joint benefit of herself and child the same weekly amount for 249 more weeks; that it had paid $150.00 for burial expenses of deceased; and that it should recover the sum of $500.00, in addition to the above amounts, as attorney's fees. It prayed for judgment accordingly, and for all future amounts to be paid, and that it be paid out of the amounts recovered by plaintiff.

Defendant does not deny the rights of intervenor to recover the amounts sued for by it in the event plaintiff recovers.

In answer defendant denied the charges of negligence contained in plaintiff's petition, and, in the language of its attorney, further answered as follows:

"For further answer, defendant averred that the accident of which the plaintiffs complained was occasioned solely and proximately by the negligence and want of care on the part of decedent, and, in the alternative, the defendant averred that Dycus, the driver of the automobile truck at the time of the accident, was guilty of contributory negligence in the following particulars:

"(1) That he approached the railroad crossing and undertook to negotiate it, without stopping, looking or listening for defendant's train, as he was required to do, both by the law and the physical conditions existing at the crossing.

"(2) That Dycus (driver) failed to exercise his natural senses of hearing and seeing. Had he done so he could have heard the movement of the train, the sounding of its whistle and the automatic ringing of the bell of defendant's locomotive.

"(3) That he ignored the warnings, admonitions and loud outcries, and the frantic waving of the red lantern of the crossing flagman, as, also the outcries of observers and passers-by who heard and saw defendant's approaching train and the approaching automobile truck as they moved inevitably toward the point of collision.

"(4) In driving said truck, when to his knowledge, the trailer thereto attached was not equipped with the brake power required by the statute law.

"(5) In turning his automobile truck to the left when he could have stopped it and avoided the accident.

"After thus particularizing the acts of negligence on the part of the driver of the automobile truck, defendant then averred that Dycus, the driver, and Martin, decedent, were fellow employees of Tom Hicks Transfer Company, the owner of the automobile truck, and that at the time of the accident they were on a common mission for their employer, then and there engaged in a joint adventure or enterprise, and that Martin was in charge and control of the movement and operation of the truck, and that the negligence of Dycus, the driver, was imputable to Martin.

"Defendant next averred, in the alternative, that Martin was himself guilty of contributory negligence immediately preceding and at the moment of the accident, independent of the negligence imputable to him from the driver, in that, seated as he was on the right side of the driver's seat of the truck, he had a better view of the direction (easterly) from which the train was coming, and if he had used his senses of sight and hearing in the exercise of ordinary care, he could have seen and heard defendant's train, its warning signals, the signals and outcries of the flagman and of the passersby at or near the scene of the accident, and in failing to stop, look and listen, and in failing to warn the driver of the truck of the approach of defendant's train."

The lower court in a written opinion found for plaintiff and awarded judgment in the sum of $10,000.00, one-half for the widow and one-half for the use and benefit of the minor child. It also awarded judgment in favor of intervenor. There is no contest now over the judgment awarded intervenor, if defendant is found liable.

Defendant prosecutes this appeal from that judgment and plaintiff has answered the appeal praying that the judgment be increased to $15,000.00, one-half for the widow and one-half for the use and benefit of the minor.

■ DeSiard street, in the city of Monroe, Louisiana, runs east and west and is the principal business thoroughfare of that city. It runs parallel with defendant's right of way and is approximately 300 feet south of it at the point where Grand and Walnut streets make out of it, both running in a northerly direction from DeSiard. These two streets come closer together as they approach defendant's tracks, which are on Jefferson, and a short distance north of said tracks, they converge and become one street. On the northeast corner where Walnut street intersects Jefferson, and south of the railroad tracks, is located the Marion Hotel which is several stories high. Grand street is west of Walnut, and between Walnut and Grand streets is located the Louisiana Hotel, which is 41 feet wide. The north wall of the said hotel is 34 feet south of the south rail of the main line of defendant's tracks. However, it is a much less distance south of the south rail of the side track. There are four tracks

at this crossing. In looking west on said right of way at a point east of the intersection of Walnut street with Jefferson, we see the main line leading to the Ouachita River bridge. Just as the main line reaches the east side of the pavement where Walnut crosses the tracks, a side track starts and runs off in a northwesterly direction. Parallel to the main line tracks, and a distance of 8½ feet south of it, is a side track. The distance given is from the south rail of the main line to the north rail of the side track; and just as this side track reaches the east edge of the pavement on Walnut street, another side track makes off of it in a southwesterly direction. This last side track makes off at a gentle curve and it is some distance into Walnut street before the rails of the last mentioned side track are entirely clear of the side-track from which it makes off.

The distance from the front north corner of the Marion Hotel to the south rail of the south side track is 9 feet. From this rail to the south rail of the next side track cannot be more than three feet at the point where the truck in which plaintiff was riding crossed it. The distance between the tracks of this last mentioned side track is 56 inches, or 4⅔ feet, and from the north rail of this side track to the south rail of the main line is 8½ feet, making it a total distance of 25 and a fraction feet from the front north corner of the Marion Hotel to the south rail of the main line.

The Marion Hotel fronts on Walnut street, and one traveling north on said street has his view to the east obstructed entirely by said hotel building until he reaches a point just north of the hotel building, which is approximately 25 feet from the main line of defendant's tracks. The right of way is higher than the street. When approaching the right of way on Walnut, beginning at a point 60 feet south of it and continuing north to the apex, which is just about the side track, one has a grade of 8%. Most of this incline is close to the first south track. The grade is steeper there than anywhere else and most of it is in the 35 feet immediately south of the track. After reaching the apex, the right of way on which the tracks are laid is approximately level for about 15 feet before reaching the south rail of the main line. It continues level for possibly 15 feet more, then there is a decline on the north of the tracks for a short distance.

The record discloses that this crossing is a very busy one, and that many automobiles and trucks pass over it on both Grand and Walnut streets every night and day. There can be no doubt about this being an unusually hazardous crossing.

On the night of the accident, which is the subject of this suit, the west-bound passenger train of defendant came into Monroe late. It stopped at the station and when it pulled out it was 20 minutes behind time. Its destination was Shreveport, Louisiana. The train left the Monroe station a few minutes after 7 P. M. Decedent was an occupant of a truck owned by the Tom Hicks Transfer Company, which had been loaded with 10,000 pounds of paper at the Brown Paper Mill Company, in West Monroe, to be delivered to Greenville, Mississippi. The driver of the truck was a man named Dycus. He and the deceased were both in the employ of the Tom Hicks Transfer Company, as truck drivers. The truck which Dycus had been driving for some months was selected to make the trip, due to the fact that it had a trailer attached. When the truck left the paper mill, Dycus was driving and a man by the name of Johnson, who was making the trip out of curiosity to find out what the United States Government wanted with so much paper, and the deceased, all occupying the front seat of the truck. Johnson was sitting in the middle and the decedent on the right side. Deceased was instructed by his employer to make the trip with Dycus to render whatever assistance was necessary. He also knew the road, having made similar trips before, while Dycus had not.

The truck was driven into Monroe over the old traffic bridge and a short distance east on DeSiard street to its juncture with Walnut, where it was turned north toward the crossing above described. The truck was traveling at a speed of approximately 15 miles per hour and, in order to make the grade with the heavy load it was carrying, it was necessary to put the truck into first low gear (it seems the truck had four gears). The truck was not stopped before arriving at the crossing, but continued on its way until the collision occurred. The incline the truck had to traverse slowed its speed down to possibly 10 to 12 miles per hour, which speed it was making just before the collision.

The evidence shows the train was moving at least at the same rate of speed as the

truck. Decedent, as soon as it was possible for him to see the oncoming train, exclaimed to Dycus, the truck driver,—"Look out for the train!" or words to that effect, at which time Dycus applied the brakes and attempted to turn the truck to the left. That he partially succeeded in his efforts is clearly shown by the physical facts. The truck never reached the first or south rail of the main line on which the train was being operated. The front part of the left cylinder of the engine, which extended south of the rail about 2 feet and which is just back of where the cowcatcher connects with the front of the engine, not more than 4 or 5 feet, came in contact with the right side of the hood of the truck. The truck became entangled with the engine in some manner and was dragged 30 or 40 feet. Deceased was snatched from the truck by the engine and crushed between the two, causing instant death. All the damage to the truck was on its right side, clearly showing that Dycus had at least partially negotiated the turn to the left after having been warned of the approach of the train by deceased. The train traveled approximately 200 feet after the emergency brakes had been applied, which was almost at the moment of the impact. The accident occurred about 7:15 P. M. in the early part of November, and at that time night had fallen. It was dark but clear.

The first questions to determine are the alleged negligences of the defendant company. The defendant's railroad traverses in an easterly and westerly direction the main part of the city of Monroe. From its passenger station to the bridge crossing the Ouachita river, there is a street crossing every block,—five in all. The distance is approximately one-half a mile. The crossing where this accident occurred is a very dangerous one and, as alleged, is extremely hazardous. The engineer on duty at the time was asked if he knew there was a City ordinance limiting the speed of trains over this section of the city to 6 miles per hour, and he answered that he understood that to be the law. Plaintiff relies upon such an ordinance and offered what she claimed was an ordinance to that effect. This document was objected to for the reason it had not been approved by the Mayor. The document offered attempts to fix the speed limit for trains in the city of Monroe at 6 miles per hour. It is signed by the Secretary

of the City and by the Committee on Legislation, which recommended its adoption, and at the bottom of the said proposed ordinance, we find the notation "approved July 17, 1899", with a blank space for the Mayor's signature intervening, and the word "Mayor". However, the signature of the Mayor is not on the document. It therefore can not be held that the ordinance was approved by the Mayor, as required by Act No. 102 of 1871, Section 7, which is the act incorporating the city of Monroe, and provides that the mayor "shall approve all laws, ordinances and resolutions of the City Council" and that "all the laws and ordinances of the Mayor and City Council shall have effect * * * after publication". Section 26.

■ The document offered was and is inoperative as a city ordinance because of the mayor's failure to signify his approval thereof by signing it. Mayor of Breaux Bridge v. Dupuis, 30 La.Ann. 1105; Town of Mandeville v. Band, 111 La. 806, 35 So. 915; Mayor v. Moss Hotel Co., 112 La. 525, 526, 36 So. 552.

■ Regardless, however, of there being no specific law or ordinance fixing the speed limit of defendant's trains while operating in the city of Monroe, there is a duty upon the defendant not to run its trains at a speed which will endanger the lives of those who make use of the streets of the city. What is excessive speed must be determined by a consideration of the hazardous conditions existing at the crossing where the accident occurred. Natal v. Louisiana & A. Ry. Co., 18 La.App. 50, 137 So. 600. And when this is done, we are convinced a speed in excess of 6 miles per hour was excessive at this particular crossing, due to the obstructions, the nearness of the two crossings to each other at Grand and Walnut streets, and the lack of mechanical devices or sufficient flagmen to properly take care of the public at the two crossings. We will discuss this later.

We are convinced from all the testimony relative to the speed of the train, that it was not traveling less than 10 to 12 miles per hour, and we feel we would be justified in finding its speed to have been not under 15 miles per hour. Defendant's witnesses, including the train crew, fix the rate all the way from 7 to 20 miles per hour. The engineer places it at 10 to 12 miles per hour. When we take into consideration the distance the train traveled

after the emergency brakes were applied and the testimony applicable to that fact, it is clear to our minds that it was traveling at an excessive speed, and it was negligence for defendant to have allowed its train to be so operated. If the train had been traveling at half the speed it was making, it is most probable that the truck driver would have negotiated the turn to the left, cleared the track and saved the life of deceased. The emergency brakes would have slowed the train down more quickly and the driver of the truck would have had more time to make the left turn.

Defendant contends that it was not negligence, in the absence of an ordinance requiring it, to fail to have a flagman or mechanical device at the crossing or to require that one of the train crew be sent ahead to flag the crossing, and cite in support of that contention the cases of Washington v. Yazoo & M. V. Ry. Co., 11 La. App. 635, 124 So. 631, and Natal v. Louisiana & A. Ry. Co., supra. In neither of the cited cases was the crossing extraordinarily hazardous, as in the case at bar. In the second cited case, the court in effect qualified the ruling contended for by defendant when it said (page 602):

"We conclude that, at the time of the accident, there was no extraordinary hazard resulting from the physical circumstances or nature of the crossing sufficient to place upon defendant the legal duty to maintain crossing gates or an automatic warning device or a watchman."

The physical conditions surrounding the crossing in the case at bar made it extraordinarily hazardous and it was the duty of defendant to maintain at said crossing "flagmen to warn the public using said crossing of the approach of the trains". That defendant recognized this duty was upon them is borne out by the fact that it did maintain a flagman at this crossing for that purpose and had done so for the past 10 to 12 years, as is shown by the record. How much longer time is not shown. The mistake made by defendant was in not providing and maintaining a flagman at both the Walnut street crossing and the Grand street. Instead it required one flagman to watch both crossings and at times it was impossible for him to do so. At no time could one watchman guard both crossings and successfully warn the public of the approaching trains unless the train was traveling very slow-

ly. It could not be accomplished when the train was traveling at a speed of from 12 to 15 miles per hour.

The record discloses that one flagman was supposed to flag the Walnut street crossing first when the train was coming from the east and then, as it approached nearer, to hurry over the Grand street crossing to flag the public there. If we should accept the testimony of the flagman on duty the night of the accident as true, which is the subject of this suit, we would have before us sufficient evidence to show the futility of one flagman attempting to protect the two crossings. However, according to his testimony, in his efforts to stop the truck in which plaintiff was riding, he remained at the Walnut street crossing and did not flag the Grand street crossing. We are of the opinion, however, that he is in error as to where he was when the accident occurred. But if he stayed where he said he did and was where he should have been, he necessarily could not have protected the Grand street crossing. If the duties of the flagman had been limited to watching the Walnut street crossing and he had performed those duties properly, the chances are great that there would not have been a collision and death on the night of November 4, 1935, when the accident we are considering occurred.

There is much conflicting testimony as to where the flagman was standing before and at the time of the accident. He places himself about 6 feet north of the main line track, a little east of the center of Walnut street. He says he saw the truck coming and began waving his red lantern slowly to stop it, but when he saw that it was not going to stop, he began to wave the lantern frantically and to hollo at the driver. He says he never moved from Walnut street. He is partially corroborated by one witness whose credibility was attacked by proving he had prior to the trial stated the flagman was near Grand street.

We will not detail all the testimony on this point, which would serve no useful purpose. It is sufficient that we are convinced from the testimony that the flagman was not standing in or near to Walnut street where he should have been. Before and at the time of the accident, he was standing north of the main line track and between Walnut and Grand streets. The two living occupants of the truck

both testified that they were familiar with the crossing, having crossed it almost daily for a long period of time. They knew a flagman was usually there and that they looked for him at the said Walnut street crossing, and he was not there. They testified the truck, when traveling in low gear as it was, made much noise and they could not and did not hear anyone hollo until a moment before the collision. One of the occupants, Johnson, said he heard the flagman holloing and he immediately looked in the direction from which the sound came, which was toward Grand street, and at that time he saw the flagman; and that the impact with the train occurred at the same moment. He did not see the train until after the collision. The flagman holloed, he looked toward him, and the train struck the truck all about the same time. That the flagman was not at the Walnut street crossing is further borne out by two witnesses for defendant, one in a car and the other on the street by the side of the car, who were at a point on Walnut street 35 feet south of the crossing, and who testified they heard the flagman hollo, but could not see him. There was nothing to prevent them from seeing him if he had been at the Walnut street crossing. We are thoroughly convinced he was not there. It was gross negligence for him not to be at this crossing.

The question of where a flagman should be when guarding a crossing is set forth plainly and clearly in the case of Roby v. Kansas City Southern Ry. Co., 130 La. 880, 58 So. 696, 41 L.R.A.,N.S., 355, in the following language (page 699):

"The ordinance does not specify what the flagman, whether it be the one who is to precede the locomotive or rolling stock, or the night and day flagman, is to do, but its meaning is plain enough for all that. He is to give warning to the public that the defendant is about to operate a life destroying agency in a thoroughfare which the public is entitled to use, in order that the individual citizen may be placed on his guard and afforded an opportunity to protect himself, either by getting out of the way or by not getting in the way. Where no night and day flagman is required, the locomotive and rolling stock must come to a full stop before crossing, and be preceded by a flagman while crossing; but at the points where danger is to be apprehended at all hours the flagman is required to be there at all hours. And by

'there' we mean at the place where human beings are expected, and where they may expect to find him; and, being there, the law expects him to keep on the alert, so as to be able, from the proper place and within the proper time, to give the warning expected of him, and to stop the locomotive and rolling stock or the individual citizen, on foot or in a vehicle, or all of them, as occasion may demand. The space occupied by the nine tracks at the crossing on Texas avenue we assume to be something like 114 feet from end to end, or along the avenue (multiplying the width of the tracks and the spaces between by 9 and 8, respectively, and allowing 4 feet, 8 inches for each track, and 9 feet for each space), and it would do those who approach that space at one end but little good if the flagman were to keep himself at the other end, nor would it meet the requirements of the situation for him to keep himself upon either of the sides; that is to say, upon the line of either of the sidewalks of the avenue, projected over the crossings, for it is not there that anyone would expect to find him or would be likely to look for his warning signal. In other words, according to our interpretation of the ordinance, it means that defendant is to keep a flagman at the crossing, and the flagman is not at the crossing of the northward track when he is 114 feet away, below the crossing of the southward track, or when he is somewhere between the two tracks upon the line of the sidewalk."

We conclude, therefore, that the negligence of the defendant in the respects above set forth was a proximate cause of the accident and death of E. L. Martin, whose widow is the plaintiff herein.

There can be no doubt as to the negligence of Dycus, the driver of the truck, and that his negligence was also a proximate, contributing cause. He drove the truck into this extraordinarily hazardous crossing without appreciably slowing down his speed. He knew the condition of the crossing and the danger of traveling it without first stopping, looking and listening. He relied entirely upon the absence of the flagman as an invitation to proceed. This alone was not sufficient to relieve him from the duty of at least reducing the speed of the truck so that he could stop immediately, or to look and listen at a place where to do so would be effective. Aymond v. Western Union Tel. Co., 151 La. 184, 91 So. 671; Gibbens

v. New Orleans Terminal Co., 159 La. 347, 105 So. 367.

This last cited case discusses and modifies the ruling on this point in the case of Roby v. Kansas City Southern Ry. Co., supra.

The remaining questions for determination are, (1) were Dycus and decedent engaged in a joint enterprise? If so, the negligence of Dycus is imputed to the deceased; and (2) was the deceased guilty of independent contributory negligence which will be a bar to recovery?

The first question is not difficult to determine. Deceased was a coemployee of Dycus. Both were in the employ of Tom Hicks Transfer Company as truck drivers. They were both subject to the orders of the same employer. Each of them had a special truck which they drove every day. On the occasion of the trip, which ended almost before it was taken, due to the accident, Dycus was driving the truck which he was accustomed to drive daily, and in the regular performance of his duties. The deceased was an occupant of the truck by orders from his employer for the purpose of rendering any necessary assistance to Dycus. Deceased had made this same trip before; Dycus had not. Therefore, deceased was familiar with the road and Dycus was not. Their employer had no objection to deceased's alternating with Dycus in driving the truck, if both were willing, but there is no testimony to show that deceased had any control over the truck as long as Dycus was driving, or that Dycus or deceased had any intention of alternating in driving the truck. It was customary for a helper to be sent along on this kind of trip to assist in unloading and to render whatever aid the driver desired. On some occasions a negro helper was used, and on others a white truck driver was taken, as in this case. Neither Dycus nor decedent had any further interest in the trip other than to carry out the orders of their master. They had no community of interest.

Being coemployees, the mere fact that they were assisting each other in the performance of a duty which they owed to their common employer does not warrant holding that they were engaged in a joint enterprise, as that term is used in the law of negligence. They owed to each other the duty to exercise ordinary care in discharging the duties of their common employer. McGonigle v. Gryphan, 201 Wis. 269, 229 N.W. 81; Bernard v. Jennings, 209 Wis. 116, 244 N.W. 589.

In A.L.I., Restatement of the Law, Vol. 2, Negligence, Par. 491, page 1273, joint adventure is defined as follows: "any one of several persons engaged in an enterprise is barred from recovery against a negligent defendant by the contributory negligence of any other of them if the enterprise is so far joint that each member of the group is responsible to third persons injured by the negligence of a fellow member."

Under said section, notation Comment (d), Fellow Servants in Vehicle, we find the following:

"The fact that the plaintiff and the driver are fellow-servants of a common master and are both acting in the course of their master's employment and in furtherance of his business does not make them participants in a joint enterprise, and this is true irrespective of whether the vehicle is owned by the master, the fellow-servant driver or by the plaintiff himself."

A determination, therefore, of the second and last question will determine the right of plaintiff to recover. Was decedent guilty of independent, contributory negligence? The question is not an easy one to decide.

We are of the opinion that the law applicable to the invited guest or a passenger for hire applies in this case, and therefore the negligence of Dycus, the driver, can not be imputed to deceased. In the case of Peterson v. New Orleans Ry. & Light Co., 142 La. 835, 77 So. 647, the plaintiff was employed by an employee of the brewing company, named Charles Kuhne, to assist him in his work of delivering beer to the customers of the brewery. They were engaged in that work at the time of the accident, when the truck and a street car collided and injured the plaintiff. In determining the case, the court said (page 648):

"There was no negligence on the part of Kuhne in attempting to cross the track as far as he was in front of the trolley car when he came into Dauphine street. If he was guilty of contributory negligence in that respect, it would not interfere with the plaintiff's right to recover damages from the railway company for the negligence of the motorman, for two reasons, viz.; First, because the motorman had the last clear chance to avoid the accident;

and, second, because negligence on the part of Kuhne could not be imputed to the plaintiff. He was no more responsible for any negligence that Kuhne might have been guilty of, than if he, the plaintiff, had been a passenger for hire."

In order to properly decide the last question, it becomes necessary to determine first what was the duty of decedent under the circumstances of this case. His duty to look out for approaching trains and to warn the driver of their approach was greater than it would have been at an ordinary crossing, which was less hazardous because of the view being unobstructed. His duty in general to protect himself from harm was greater than it would have been in crossing a street intersection where there was no railroad. A fact that made the duty of deceased greater at this particular crossing was that he was thoroughly familiar with the extraordinary hazards of the crossing for the reason he had made use of it daily for many years.

Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition, § 2475, Vol. 4, p. 262, lays down what is the duty of a guest in an automobile approaching a railroad crossing, in the following words:

"There is imposed upon each passenger in an automobile, approaching a railroad crossing, the independent duty of looking and listening. A guest, particularly one riding in the front seat of the automobile, is required, when the vehicle approaches a railroad or street railroad track or crossing to exercise ordinary care for his own safety by the use at a reasonable distance therefrom of his faculties of sight and hearing to discover the presence or approach of trains or cars so that he can by ordinary care inform the driver in time to prevent a collision with any train or car approaching the crossing; and, if he discovers or by ordinary care can discover an existing or imminent peril to their safety from such instrumentalities in time to warn the driver thereof, and thereby prevent a collision, his failure to do so is contributory negligence, precluding a recovery by him for injuries received from an ensuing collision.

"The duty is not removed or the bar avoided by a haphazard or partial observation of conditions at the crossing or along the track. Thus, when the obligation exists, the guest must, where the exercise of due care requires it, look on both sides of the crossing, and does not discharge his duty by looking in one direction only.

"So, where conditions at the crossing and along the track are such that, in view of the respective speeds of the train or car and the automobile, a guest in the latter must necessarily have been able to see the former had he maintained any sort of an efficient lookout, since the train was plainly visible in ample time to guard against the danger of its approach, a failure to see indicates a failure to look, and thus tends to establish the contributory negligence of such guest.

"Where extensive visibility along the railroad tracks exists in both directions from the crossing, the fact that a passenger does not see the train until the automobile wherein he is riding is on the track affords evidence that he did not look for the train until then.

"However, the rule that a motorist who fails to look or listen for trains violates a special legal duty and is negligent as a matter of law is not ordinarily applied in all its force to a passenger or an invited guest who has no control over the driver or the management of the car; and one in that position is not bound under all circumstances to use his senses or to look or listen in order to discover approaching railroad or street cars, or other dangers. Instead, the extent to which he should appreciate an impending peril and act in relation thereto depends upon the facts peculiar to his case.

"In Louisiana, indeed, the doctrine has been flatly announced as a proposition of law that such an occupant of an automobile is under no duty, absent extraordinary circumstances or conditions, to keep a lookout."

The cases cited under the Louisiana doctrine above referred to are Chanson v. Morgan's L. & T. R. R. & S. S. Co., 18 La.App. 602, 136 So. 647, and Churchill v. Texas & P. Ry. Co., 151 La. 726, 92 So. 314.

To the same effect are Franklin v. Louisiana & A. Ry. Co., 10 La.App. 526, 120 So. 679; Daull v. New Orleans Ry. & Light Co., 147 La. 1012, 86 So. 477; Peterson v. New Orleans Ry. & Light Co., 142 La. 835, 77 So. 647; Roby v. Kansas City Southern Ry. Co., 130 La. 880, 58 So. 696, 41 L.R.A.,N.S., 355.

Defendant does not discuss the above cited cases, but relies upon the following:

Leopold v. Texas & P. Ry. Co., 144 La. 1000, 81 So. 602; Lockhart v. Missouri Pacific Ry. Co., La.App., 153 So. 577; Williams v. Lenfant, 15 La.App. 515, 131 So. 857; Banfield v. Louisiana Ry. & Nav. Co., 18 La.App. 86, 137 So. 571, and Delaune v. Breaux, 18 La.App. 609, 135 So. 253, which, it contends, hold to a different view, and the passenger or guest is required to use ordinary care and has an independent duty to perform for his own safety; and failure to use ordinary care bars his recovery in case of an accident; that the guest's failure to use reasonably ordinary care for his own safety is independent contributory negligence.

We agree with defendant's contention as to the holding in these cases. The conflict between the two lines of decisions cited above is very apparent and has caused much confusion.

Defendant relies further upon a paragraph taken from § 2478, Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition, Vol. 4, p. 277, which is as follows:

"It has been broadly stated that a passenger sitting in the front seat of an automobile, who is familiar with a railroad crossing which he is approaching, yet makes no protest as to the manner in which the car is being operated, is ordinarily deemed contributorily negligent if the driver would be so considered; and an adult automobile passenger, in the full possession of normal faculties, and in complete awareness of the situation, who without protest or warning acquiesces in the negligence of the driver, adopts that negligence as his own."

Under the same paragraph, after citing many examples, it states on page 280, the following:

"What has heretofore been said in this section may seem to indicate that an automobile passenger, while approaching railroad or street railroad tracks, is generally and as a matter of course under the duty of warning the driver with reference to conditions along the track, and of protesting at any deviations by the latter from the standard of ordinary care. Exactly the contrary is true. The duties of warning or protest, instead of being ordinary incidents of such a situation, exist only in the extraordinary and unusual case. In reality, the situations where the duty is recognized are generally classifiable into those where the peril, whether from trains or cars or from the driver's manner of operation, is imminent and extreme, those where the guest has superior awareness of the dangerous condition and should place the added information at the driver's disposal, and those where the presence of the guest has itself increased the driver's danger by obstructing his view. A guest in the automobile of another is neither required nor expected to advise or direct the operation or management thereof while approaching a railroad or street railroad crossing, as to do so might well be harmful rather than helpful."

In Central of Georgia Ry. Co. v. Watkins, Federal Circuit Court of Appeals, 5th Circuit, 37 F.2d 710, a case very familiar in facts to the one at bar, the court said (page 711):

"Ordinarily, it is not the duty of one riding in an automobile by invitation to direct the movements of the driver, unless the former has knowledge of some danger that is not obvious or is unknown to the latter; but, even under such circumstances, the guest must exercise reasonable care for his own protection."

In that case, the view of the guest was obstructed until he was within 30 feet of the railroad track, at which time he saw the train and called to the driver to "look out!" Recovery was allowed him for injuries received in the collision which followed. He had used reasonable care for his own protection, although he had not commanded the driver to stop before entering the crossing.

We are of the opinion that it is the independent duty of a passenger or guest, when the vehicle in which he is riding is about to traverse a railroad crossing, to use ordinary, reasonable care for his own safety; that the care and precaution required of him is not as great as is that required of his host, and that the passenger or guest has the right to rely upon the driver to take the necessary precautions for his own safety and his safety until such time as the guest or passenger realizes by observation or otherwise, or should have realized by the use of ordinary care, that the driver is oblivious of the perils and dangers ahead or that he is disregarding them. This is particularly true when the guest or passenger knows that the driver is familiar with the location and the hazards surrounding it. Until such time as the actions of the driver indicate neg-

ligence, and the passenger or guest by the exercise of ordinary care has or should have discovered the perils confronting him, he is under no duty to enter a protest.

Adopting the above rule, we shall judge the actions of the deceased in this case.

■ Dycus, the driver, and the deceased were both very familiar with the crossing of Walnut street with defendant's railroad. They had both negotiated it daily for months and possibly years. They both knew of the extraordinary hazards of the crossing, caused by the obstructions to the view and the rather sharp incline approaching it from the south. They were both truck drivers in the employ of the same company and, no doubt, experts in handling trucks, even when heavily loaded, as the truck was at the time of the accident. Each knew the other possessed this information. The speed of the truck until it reached the sharpest part of the incline, which was approximately 35 feet from the tracks, was about 15 miles per hour. This was not excessive. When it reached the crest of the incline and the level part of the crossing, it had slowed down considerably to possibly 8 or 10 miles per hour. It was then 15 to 16 feet from the point of accident, and could have been stopped within that distance, according to the testimony of Dycus. Either party in the truck could have seen the train approaching when the truck passed the north end of the Marion Hotel, which was 25 to 26 feet from the locus of the collision. Had Dycus looked, he would have seen the train and could have brought his truck to a standstill before reaching the main line track, which was occupied by the train. He evidently did not look. The deceased did look. He saw the approaching train and, we are of the opinion, he saw it as soon as it was possible for him to see it, due to the obstructions. When he saw it, he exclaimed, "Lookout for the train!" or words to that effect. As soon as his warning registered on Dycus, he applied his brakes and attempted to turn the truck to the left. He partially succeeded in making the left turn, in fact he turned far enough to the left to prevent the front of the truck from striking the engine.

When we apply the rule laid down above to these facts, we are convinced the deceased was not guilty of any contributory negligence that was a proximate cause of the accident and his death.

Defendant contends that it was the duty of the deceased to have called on Dycus to stop the truck before entering the crossing. We do not think it was his duty, under the facts of this case. He had the right to assume that Dycus would stop, although the late decisions of our courts are to the effect that the failure to stop before crossing a railroad track does not necessarily and in all events preclude recovery, unless it appears that the failure to stop was a proximate cause of the accident. Robertson v. Missouri Pacific Ry. Co., La.App., 165 So. 527; Aaron v. Martin, La.App., 167 So. 106; Dobrowolski v. Holloway Gravel Co., La.App., 173 So. 474.

Dycus had time and space within which to stop the truck after he could see the train. He was at that time going upgrade. There was no reason for deceased to believe he was not coming to a stop until the truck was a few feet south of the north wall of the Marion Hotel. The flagman who claims he was watching the truck did not realize it was not going to stop until it was at that point. We judge from this fact that the speed of the truck was not such as to indicate to the mind of the flagman that it was not going to be stopped. We arrive at this fact from the following pertinent facts by defendant's witnesses: the flagman said that as soon as he realized the truck was not going to stop, he waved his red lantern frantically. The engineer saw him when he did that and said the train was then 20 or 30 feet from the place of the accident. At that time the truck and train were traveling at approximately the same rate of speed. Therefore, taking the testimony of the flagman and the engineer on this fact as true, it is easy to place the truck at the same distance from the point of accident as was the train, which was approximately 30 feet, and which is about 4 feet south of the north side of the Marion Hotel. If the truck had continued at the rate of 10 miles per hour, it would have negotiated the remaining distance of approximately 30 feet in about two seconds. If the flagman, whose sole duty was to stop this truck and other vehicles, and was watching it as he said, did not think or realize the truck was not going to stop until it was within two seconds' time, or 30 feet distant from the main line, it would not be reasonable to expect deceased to realize before this time

that Dycus was not going to stop, when at that time he could not see the train, did not know it was coming, undoubtedly believing the track was clear, due to the absence of a flagman, knowing Dycus was familiar with the location and its hazards and that he was a capable driver. If he did realize it, or should have realized, when the truck was 30 feet from the main line that Dycus was not going to stop it, it was then only a fraction of a second, less than 2/7ths, before he saw the train and made the exclamation about it.

It was not the failure to stop before entering the crossing that was the proximate cause of the accident. The proximate cause, so far as Dycus was concerned, was his failure to look at the time his view became unobstructed. If he had looked, he would have seen the train and could have prevented the accident. The truck at that time was still on the incline.

We are convinced the deceased exercised ordinary care for his own protection. He looked as soon as it was possible to see and exclaimed what he saw as a warning to the driver. The time it took for the sight to register, for deceased to exclaim, for the exclamation to register on Dycus' mind, for him to apply the brakes and for them to take effect, undoubtedly consumed at least a second. The remaining time was not sufficient to avoid the accident. It was not the fault of the deceased that Dycus did not see what the deceased saw as soon as he saw it. He did all that was within his power to warn Dycus after seeing the train.

The judgment of the lower court found defendant liable for the death of E. L. Martin, and is correct.

In answer to the appeal, plaintiff prayed that the judgment be increased from $10,000.00 to $15,000.00.

Deceased was 27 years of age at the time of his death. His wife was 23 years and their child three years of age. Deceased's salary was $18.00 per week at the time. We are of the opinion a judgment for Twelve Thousand Dollars ($12,000.00), divided equally between the child and the widow, will do substantial justice, and is more in line with the jurisprudence in the cases of like nature.

The judgment of the lower court is therefore amended by increasing the total amount of the award from $10,000.00 to $12,000.00, and, as amended, is affirmed.